No. 25-1607

# United States Court of Appeals for the Federal Circuit

## In re: VELCRO IP HOLDINGS LLC,

*Appellant.*

APPEAL FROM UNITED STATES PATENT AND TRADEMARK OFFICE, PATENT TRIAL AND APPEAL BOARD IN NO. 17/567,188

## VELCRO'S PRINCIPAL BRIEF

Lauren A. Degnan
Joseph R. Dorris
FISH & RICHARDSON P.C.
1000 Maine Avenue, S.W.
Suite 1000
Washington, DC 20024
Tel: (202) 783-5070
degnan@fr.com

Kenneth W. Darby
FISH & RICHARDSON P.C.
111 Congress Avenue
Suite 2000
Austin, TX 78701
Tel: (512) 472-5070

July 11, 2025

*Attorneys for Appellant
Velcro IP Holdings LLC*

## <u>EXEMPLARY CLAIM OF U.S. PATENT APP. NO. 17/567,188</u>

19. A male touch fastener product, comprising

      a resin surface;

      an array of spaced-apart male touch fastener elements carried on the surface, each touch fastener element extending to an overall height above the resin surface and comprising

            a stem extending from the surface and having a minimum lateral extent and a bend height defined as the perpendicular distance from the resin surface to a lowermost occurrence of the minimum lateral extent; and

            a flat, disc-shaped head disposed at a distal end of the stem, and forming with the stem and the surface a contiguous mass of resin, the head extending laterally from the stem to a distal edge overhanging the surface, the head having an overall lateral extent and having an overhang midpoint thickness measured parallel to the stem from an underside of the head to an upper surface of the head at a position midway between the stem and the distal edge;

      wherein for at least most of the fastener elements of the array, the ratio of Edge Flex Ratio to Stem Bending Coefficient is between 0.3 and 6.0, where Stem Bending Coefficient is a ratio of a difference between overall height and bend height to the minimum lateral extent, and Edge Flex Ratio is a ratio of a difference between the overall lateral extent of the head and the minimum lateral extent of the stem to the overhang midpoint thickness.

Appx17.

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellant Velcro IP Holdings LLC ("Velcro") certifies the

following:

1.     Provide the full names of all entities represented by undersigned counsel in this case.

**Velcro IP Holdings LLC**

2.     Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

**None/Not Applicable**

3.     Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

**Velcro Inc.; Velcro Holdings Belgium BV; VIL LTD**

4.     List all law firms, partners, and associates that (a)appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court.  <u>Fed. Cir. R. 47.4(a)(4)</u>.

**Fish & Richardson P.C.: James W. Babineau**

5.     Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under <u>Fed. Cir. R. 47.5(a)</u>?

**None/Not Applicable**

6.     Provide any information required under <u>Fed. R. App. P. 26.1(b)</u> (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). <u>Fed. Cir. R. 47.4(a)(6)</u>.

**None/Not Applicable**

Dated:  July 11, 2025                    */s/ Lauren A. Degnan*
                                        Lauren A. Degnan

i

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................... iv

STATEMENT OF RELATED CASES ................................................. 1

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF THE ISSUES ........................................................... 1

INTRODUCTION ................................................................................ 2

STATEMENT OF THE CASE............................................................. 3

I.      The '188 Application ............................................................... 3

II.     The Tuma Prior Art Reference .............................................. 11

III.    The Proceedings Before the Patent Office ........................... 13

        A.      The Examiner Rejected the '188 Application Based on
                REV ............................................................................ 13

        B.      Velcro Appealed to the Board.................................... 17

        C.      The Board's Final Written Decision .......................... 22

SUMMARY OF THE ARGUMENT .................................................. 24

STANDARD OF REVIEW ................................................................ 25

ARGUMENT ..................................................................................... 26

I.      The Board Erred in Its Result-Effective Variable Analysis by
        Failing to Apply the Proper Legal Standard ......................... 26

        A.      The REV Doctrine Requires Determining Whether the
                Claimed Variable and Its Corresponding Result Are
                Recognized in the Prior Art......................................... 26

        B.      The Board Erred in Identifying the "Variable" for Its
                REV Analysis ............................................................. 31

        1.     The Board Did Not Use the Claimed Ratios as the "Variable" ................................................................. 31

        2.     The Board Failed To Find That All the Parameters Are Result-Effective ................................................ 34

        3.     Reversing the Board's Decision Will Promote Consistency Before the Agency ............................... 36

   C.    The Board Erred in Identifying a "Result" for Its REV Analysis ................................................................. 37

   D.    The Court Should Reverse the Board's Erroneous Application of the REV Doctrine .......................................... 42

II.   Substantial Evidence Does Not Support the Board's Decision Because Tuma's Disclosure Is Akin to a Broad Range That Does Not Invite Routine Optimization ........................................ 44

CONCLUSION ................................................................. 52

ADDENDUM ................................................................... 54

CERTIFICATE OF SERVICE AND FILING ....................................... i

CERTIFICATE OF COMPLIANCE ................................................ ii

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Aller*,
220 F.2d 454 (C.C.P.A. 1955) ...........................................14, 15

*In re Antonie*,
559 F.2d 618 (C.C.P.A. 1977) .......................................*passim*

*In re Applied Materials*,
692 F.3d 1289 (Fed. Cir. 2012) .......................25, 28, 38, 48

*Bilski v. Kappos*,
561 U.S. 593 (2010)...............................................34

*Ex. Parte Bouldin*,
Appeal 2019-005707 (PTAB Apr. 23, 2020) ........................36

*Consol. Edison Co. v. N.L.R.B*,
305 U.S. 197 (1938)...............................................25

*Corning v. Fast Felt Corp.*,
873 F.3d 896 (Fed. Cir. 2017) ...................................44

*In re Davies*,
475 F.2d 667 (C.C.P.A. 1973) ....................................29

*E.I. DuPont de Nemours & Co. v. Synvina C.V.*,
904 F.3d 996 (Fed. Cir. 2018) ..................................*passim*

*Gen. Elec. Co. v. Raytheon Techs. Corp.*,
IPR2020-00346, Paper 9 (PTAB June 23, 2020) ..................36

*Gen. Elec. Co. v. United Techs. Corp.*,
IPR2018-01123, Paper 8 (PTAB Nov. 29, 2018)................36

*Gen. Elec. Co. v. United Techs. Corp.*,
IPR2019-00213, Paper 12 (PTAB May 13, 2019) ..............36

*Genentech, Inc. v. Hospira, Inc.*,
   946 F.3d 1333 (Fed. Cir. 2020) .......................................................27

*Graham v. John Deere Co. of Kansas City*,
   383 U.S. 1 (1966) .............................................................2, 42, 52

*Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*,
   No. 2025-1228, 2025 WL 1874090 (Fed. Cir. July 8, 2025) ............................30

*In re Kahn*,
   441 F.3d 977 (Fed. Cir. 2006) ........................................................33

*Ex parte Levasseur*,
   Appeal 2021-001420 (PTAB Oct. 21, 2021)...............................................36

*ModernaTx, Inc. v. Arbutus Biopharma Corp.*,
   18 F.4th 1364 (Fed. Cir. 2021) .......................................................34

*Novozymes A/S v. Dupont Nutrition Biosciences APS*,
   723 F.3d 1336 (Fed. Cir. 2013) .......................................................33

*Pfizer Inc. v. Sanofi Pasteur Inc.*,
   94 F.4th 1341 (Fed. Cir. 2024) ...............................................27, 42, 46

*In re Stepan Co.*,
   868 F.3d 1342 (Fed. Cir. 2017) .......................................................51

**Statutes**

35 U.S.C. § 103...............................................................13, 24, 33

**Other Authorities**

MPEP (9th ed. Rev. 10.2019, June 2020)................................................15

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Velcro IP Holdings LLC ("Velcro" or "Appellant") is unaware of any other appeals arising from the same proceeding or any other cases that will directly affect or be directly affected by this Court's decision in the pending case.

## JURISDICTIONAL STATEMENT

Velcro appeals from a final written decision of the Patent and Trial Appeal Board ("Board"), issued January 24, 2025. Appx2-16. Velcro timely filed its notice of appeal with the Board on March 27, 2025, within the 63-day deadline set by the applicable statutes and regulations. *See* 35 U.S.C. § 142; 37 C.F.R. § 90.3(a)(1). This Court thus has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(a).

## STATEMENT OF THE ISSUES

1.     Whether the Board applied an improper legal standard for determining that a variable is result-effective.

2.     Whether the Board's result-effective variable findings lack substantial evidence because the prior art's disclosure is akin to a broad range that does not invite routine optimization.

## <u>INTRODUCTION</u>

Velcro respectfully asks this Court to correct the Board's misapplication of the result-effective variable ("REV") doctrine in this case and thereby clarify that this doctrine may not be used to circumvent the obviousness requirements of *Graham v. John Deere Co. of Kansas City*, <u>383 U.S. 1</u> (1966).

For over seventy-five years, Velcro has been a pioneer in the field of touch fasteners including with its revolutionary hook and loop technology. Touch fasteners enable "releasable engagement" between surfaces, making them indispensable in a wide variety of products from diapers to construction materials. This functionality is typically achieved through an array of small male fastener elements (such as hooks) on one surface that engage with a field of loops on the other. Given the diverse applications for touch fasteners, there is continual demand for innovations in fastener element design and methods to make them. As such, Velcro remains committed to advancing the field through ongoing investment in research and development.

In this case, Velcro's rejected claims include limitations that the Board acknowledged are not "inherent or necessarily follow[] from explicit teachings." <u>Appx13</u>. The specification also provides details about the functional effect of these limitations that the Board admitted "the prior art is not necessarily concerned with understanding." <u>Appx14</u>. Yet, the Board dismissed these distinctions in its

obviousness analysis by simply labeling the missing claim limitations as "result-effective variable[s]."  Appx7.

In other words, the Board invoked the REV doctrine without determining that the prior art discloses the claimed "variable" or even all of its constituent parts. The Board also assumed that a skilled artisan would arrive at the claimed range by optimizing for the "result" disclosed in the prior art—which is different from the unrelated "result" the '188 application teaches—without finding any relationship between the two results.  The Board's application of the REV doctrine thus exceeds its intended use and logical foundation, serving merely as a pretext to bridge gaps in the prior art with impermissible hindsight.  The Court should reverse the Board's decision.

## STATEMENT OF THE CASE

### I.    THE '188 APPLICATION

Velcro filed U.S. Patent Application No. 17/567,188 ("'188 application"), titled "Male Touch Fastener Elements," on January 3, 2022.  Appx25-61.  The '188 patent application claims priority to U.S. Patent Application No. 16/699,790 and U.S. Provisional Patent Application No. 62/774,459 (filed December 3, 2018) and incorporates them by reference.  Appx43 (1:3-5).

Engagement with male fastener elements can be achieved by engaging with a field of fibers or loops (*see* Figure 1 below) or in some cases "male fastener

elements can be shaped and spaced so as to releasably engage a similar array" of

other male fastener elements. <u>Appx43</u> (1:11-14).



**FIG. 1**

The '188 application explains that "[s]ome male fastener elements have heads that

overhang along only one lateral direction . . . (often referred to as J-shaped or palm

tree fasteners) [which] tend to have very directional engagement characteristics."

*Id.* (1:14-17).  Other types of elements that "overhang in multiple directions (or in

all directions)" are "often referred to as mushroom-shaped fasteners" and "have

engagement characteristics that are more uniform in all directions."  *Id.* (1:14-18).

"Each type of male fastener element has its preferred uses in commercial

products."  *Id.* (1:18-19).  For example, "[m]ushroom-shaped fastener elements can

be made with fairly thin heads, for engagement with very low loft fibers as tend to

be found in inexpensive non-woven materials."  *Id.* (1:19-21).

The '188 application teaches improvements to touch fastener elements and

the resulting benefits of its embodiments.  For example, "due in part to their size,

arrangement and specific design features, arrays of such fastener elements can be made to exhibit particularly advantageous levels of ***softness to the human touch***." Appx46-47 (4:30-5:1).[1]  The '188 application elaborates on this benefit, explaining that the inventors "have found samples of fastener product produced according to the above method to be particularly soft to the touch in comparison with certain other touch fasteners considered to exhibit softness." Appx56 (14:3-5).  The '188 application further describes objective testing—such as the "mean Toccare micro-texture coarseness measurement"—against other touch fastener types such as the head shapes disclosed in Figures 1A-4 of U.S. Patent Application No. 15/680,447 and the "molded polypropylene palm-tree hook . . . for use in disposable diapers." *Id.* (14:5-21).  The inventors disclose that their measurements "were consistent with [their] subjective impression that the product produced as described above was significantly softer to the touch." *Id.* (14:22-23).

The '188 application describes additional benefits of the claimed invention. For example, it discloses that "[t]he fastener elements described herein can be formed at very high speeds in the production of inexpensive fastener products" and "arrays can be formed on resin sheets such that it can be difficult for a layperson to tell which side of the sheet is the fastening surface without engaging the surface with fibers." Appx46-47 (4:29-5:3).

---

[1] All emphasis is added unless noted otherwise.

To explain the invention, the specification describes the embodiments by first teaching various relevant measurements of the male fastener elements. For example, the specification describes that each element has an overall **height H**. Appx49 (7:23). The specification adds that the stem has a **nominal stem diameter S** over the length of the stem including its midpoint height, blending into **a radius at the base of the stem at a distance J from the base sheet**. *Id.* (7:27-28). The patent also defines measurements of the **diameter of the head C** and a **head thickness CT**. Appx50-51 (8:29-9:2). CT is measured parallel to the stem at a midpoint of the overhang distance (**OH**), which is half the difference between the diameter of the head and the stem diameter (($C$-$S$)/2). Appx50-51 (8:31-9:2)



Appx30 (Fig. 7) (annotations added); Appx30 (Fig. 6) (annotations added).

The '188 application teaches various phenomena that arise by modifying the dimensions of the male fastener elements. For example, "[d]istance '**J**' is related to the flexibility of the fastener element in response to a lateral load applied at the head, as the stem will tend to bend at or near the lowest extent of the straight shank of the stem." Appx50 (8:2-4); Appx32 (Fig. 10). Accordingly, the rest of the brief will refer to **J** as "bend height." Appx17. The inventors "observed how readily the above-described flat-topped mushroom fastener elements can bend in response to lateral loads applied to the head, such as by a finger applying light pressure as it moves across the field." Appx50 (8:5-7).

The '188 application teaches that the male fastener element's tendency to bend is related to both the "moment arm between the upper surface of the fastener element and its preferred bending point near the base of the stem, and the minimum lateral stem dimension at that point." *Id.* (8:9-10). Thus, the specification teaches a variable called Stem Bending Coefficient (**SB**) which is the ratio of **H**-**J** (moment arm) to **S** (stem dimension at that point), and that this ratio is preferably between 1.0 and 2.5, and more preferably between 1.4 and 2.0. *Id.* (8:11-12).

$$SB = \frac{H - J}{S}$$



FIG. 7

Appx50 (8:11); Appx30 (Fig. 7) (annotations added).

The specification also teaches that the edge of the fastener element head can flex upward in response to a fiber-applied point load (*see* Figure 10, Appx32, reproduced right)[2] and "this flexibility is related both to the head overhang distance [(**C**-**S**)/2] and its thickness" (**CT**).  Appx51 (9:23-25); Appx50 (8:28-29). Accordingly, the application teaches a variable Edge Flex Ratio (**EF**), which is the ratio of the difference between head and stem widths to the nominal cap thickness or **EF** = (**C**-**S**)/**CT**.  *Id.* (9:26-27).



FIG. 10



The Edge Flex Ratio is preferably between 1.0 and 5.0.  *Id.* (9:28).

$$EF = \frac{C - S}{CT}$$

---

 [2] The '188 application teaches that the average cap diameter **C** was found to be in the range from 0.077 to 0.123 mm.  Appx49 (7:16-17).

Appx51 (9:26-27); Appx30 (Fig. 7) (annotations added); Appx30 (Fig. 6) (annotations added).

The specification further describes benefits that can be obtained using certain relationships between **EF** and **SB** as defined above. For example, "[i]n some cases the relative flexibility of rim edge and stem is important." Appx52 (10:22). The specification "define[s] Edge Flex Preference as the ratio of Edge Flex Ratio and Stem Bending Coefficient, or EF/SB." *Id.* (10:23-24). "This parameter relates to the relative flexibility of head edge and stem: the higher the value, the more the edge . . . will flex before the stem itself bends over to help align the load and prevent release." *Id.* (10:24-26). The specification says that, "[f]or resistance of shear loads when engaged with fine fibers, Edge Flex Preference of a flat disk-headed fastener element is preferably between 0.3 and 6.0, more preferably between 0.5 and 5." *Id.* (10:26-28).

$$Edge\ Flex\ Preference = \frac{EF}{SB} = \frac{\frac{C-S}{CT}}{\frac{H-J}{S}} = \frac{(C-S)(S)}{(CT)(H-J)}$$

Appx52 (10:23-24).

The specification teaches that the described fastener elements are "advantageously flexible in multiple modes in response to a laterally applied head load." *Id.* (10:10-11). The specification "coin[s] the term Total Flexure Product (TF)" as related to the two flexure modes described above: (1) "[t]he stem will

9

tend to elastically bend over to tilt the head" and (2) "the rim of the head may flex locally out of its plane to form a local side depression that helps to retain a fiber pulling on the head edge." *Id.* (10:9-15). Total Flexure Product is the product of the SB and EF or TF=SB*EF. *Id.* (10:15-16).

$$Total\ Flexure\ Product = SB * EF = \frac{H - J}{S} * \frac{C - S}{CT}$$

According to the '188 application, "[t]he greater either of the two factors, the greater the overall flexure of the fastener element in response to a lateral load applied locally at the edge of the head." *Id.* (10:17-18). Therefore, "[f]or resins suitable for high speed formation of fastener elements, the Total Flexure Product is preferably greater than 3.0, or between 3.0 and 10.0." *Id.* (10:18-20).

The rejected claims include the preferred range for Edge Flex Preference ("ratio of Edge Flex Ratio to Stem Bending Coefficient" or "(EF/SB)") in claim 19 and the preferred range for Total Flexure Product ("SB*EF") in claim 33 (collectively, "claimed ratios").[3]

For this appeal, the Board held that claim 19 of the '188 patent, which recites values for the Edge Flex Preference, is representative (Appx4):

---

[3] As explained above, Edge Flex Preference corresponds to: [**S***(**C**-**S**)] / [**CT***(**H**-**J**)], whereas Total Flexure Product corresponds to: [(**C**-**S**)*(**H**-**J**)] / [**CT**\***S**]. Both are thus ratios.

19. A male touch fastener product, comprising

> . . . the ***ratio of Edge Flex Ratio to Stem Bending Coefficient*** is between 0.3 and 6.0, where Stem Bending Coefficient is a ratio of a difference between overall height and bend height to the minimum lateral extent, and Edge Flex Ratio is a ratio of a difference between the overall lateral extent of the head and the minimum lateral extent of the stem to the overhang midpoint thickness.

Appx17.

## II.    THE TUMA PRIOR ART REFERENCE

The Board rejected the pending claims as obvious over U.S. Patent Application Publication No. 2013/0067702 ("Tuma"), titled "Adhesive Closure Piece." Appx346-53; Appx16. Tuma "relates to an adhesive closure piece, comprising a backing part and closure parts . . . . and in each instance has a head part." Appx351 at [0001]. "FIG. 1 shows a section of a touch-and-close fastener part 10 comprising a backing part 12, on which closure parts 20*a*-20*i* are arranged, of which a head part 14*a*-14*i* is visible in each instance." Appx352 at [0016].



Fig.1

Appx347 (Fig. 1).

Tuma's background asserts that the prior art "discloses methods for modifying the surfaces of an object in order to enhance the adhesive force of the object." Appx351 at [0002]. Tuma explains that "[c]ontact surfaces in a magnitude of 0.2 to 0.5μm$^2$ enable an interaction with a corresponding additional component . . . , to which the touch-and-close fastener part is to be secured by means of the so-called Van der Waals interaction, which is considered to be in classical terms a subgroup of adhesion." *Id.* at [0003]. Tuma identifies that "[t]he prior art touch-and-close fastener part exhibits good connecting properties but is associated with a time-consuming and, thus, cost-intensive manufacturing process." *Id.* Tuma continues that there is "still room for improved solutions with respect to the adhesion and separation properties of the touch-and-close fastener part." *Id.*

Tuma says "the object of [its] present invention is to enhance the adhesion and separation properties of the touch-and-close fastener part . . . , so that it is possible to eliminate excessive loads on and damages to the closure parts." Appx351 at [0004]. Tuma therefore teaches various embodiments of different end surface shapes with "tear-off edge" features that "facilitate[] the separation of the contact surface." *Id.* at [0005]. Tuma further discusses the "contact surface of at least one head part is modified in such away that it is enlarged or decreased." *Id.*

Tuma provides various embodiments of its "head part" in Figs. 2a-2d (below). Appx348.

Tuma's Figure 3 is a "sectional view of two closure part [sic]" which has certain measurements.  Appx352 at [0014].  Tuma's specification states that contact surfaces 22a and 22b are equidistant $x_3$ from the backing part 12.  *Id.* at [0021].  Tuma also describes that stem part 24a has a thickness $D_S$ and stem part 24b has a tapering $y_2$ and widening $y_3$.  *Id.* at [0021].



Appx348 (Figs. 2a-2d); Appx349 (Fig. 3) (annotations added).

## III.    THE PROCEEDINGS BEFORE THE PATENT OFFICE

### A.    The Examiner Rejected the '188 Application Based on REV

On October 26, 2022, the examiner rejected the claims under 35 U.S.C. § 103 based on Tuma.  Appx97-102.  The examiner admitted, however, that Tuma "does not explicitly disclose" the claimed ratios.  Appx97.  The examiner held that

13

"[i]t would have been obvious to one having ordinary skill in the art at the time the invention was made to have a ratio of Edge Flex Ratio to Stem Bending Coefficient is [sic] between 0.3 and 6.0 and further 0.5 to 5.0, since it has been held that where the general conditions of a claim are disclosed in the prior art, discovering the optimum or workable ranges involves only routine skill in the art." Appx97-98 (citing *In re Aller*, 220 F.2d 454, 456 (C.C.P.A. 1955)).  The examiner asserted that "the prior art has the claimed measurements in the ratio of lateral extent, lateral extent of stem, overhang, overall height, bend height" and therefore the "claimed measurements are present and known in the art."  Appx98.  The examiner also noted that "[a]pplicant's nomenclature does not preclude the prior art from meeting the ratio with obviousness motivation" and "applicant has not disclosed any criticality for the claimed limitations."  *Id.*

Velcro challenged the rejection because *Aller* does "not stand for the proposition that such optimization would be considered obvious for any attributes as yet unknown to be significant in the art."  Appx196.  Velcro argued that "a particular parameter must first be recognized as a result-effective variable, i.e., a variable which achieves a recognized result, before the determination of the optimum or workable ranges of said variable might be characterized as routine experimentation."  Appx197 (citing *In re Antonie*, 559 F.2d 618, 620 (C.C.P.A.

1977)).[4]  Velcro explained that "[t]he recited parameters are ***relationships***, not individual dimensions."  *Id.* (original emphasis).  Furthermore, "[t]hat the prior art may have measurements from which those relationships may be calculated does not mean that the ***relationships themselves are recognized to be result-critical***."  *Id.* (original emphasis).

Velcro explained that "[i]n the context of the present invention, *In re Aller* range optimization would have been applicable, perhaps, had the distinction with Tuma been merely a recitation of fastener element height, for example, and had the prior art shown that height was a result-effective variable in fastener elements.  That is not the case here."  *Id.*

In a Final Rejection, the examiner found "[Tuma] has the claimed features to meet the claimed elements, but not explicitly as Applicant's ratio terms and in the range claimed."  Appx206-07.  With respect to the Velcro's "relationship" argument, the examiner "note[d] that the ratio relationships are affected by changes of the variables within the ratio, and therefore, the ratios are result-critical (i.e. changing one variable, fastener height, effects [sic] the attachment strength of the fastener heads)."  Appx207-08.  The examiner argued that "the prior art has disclosed that weaker and stronger attachment force is affected by variables such

---

[4] Velcro's reply mistakenly quotes this sentence as being from *Antonie* but the quotation is the characterization of the holding of *Antonie* in the Manual of Patent Examining Procedure § 2144.05(II)(B).  MPEP (9th ed. Rev. 10.2019, June 2020).

as fastener height."  Appx208.  The examiner summarized that "the variables of the ratio are result-effected as changing one variable will alter the ratio thereby influencing attachment strength."  Appx210.

In response, Velcro reiterated that "[a] particular parameter must first be recognized as a result-effective variable, i.e., a variable which achieves a recognized result, before the determination of the optimum or workable ranges of said variable might be characterized as routine experimentation."  Appx216 (citing *Antonie*, 559 F.2d at 620).  "It must be remembered that when the *In re Antonie* line of cases speak of a 'parameter' or a 'variable' being result-effective, ***they are speaking of the parameter or variable recited in the claim as being within a numerical range*.**  *Id.* (original emphasis).

In response to the examiner's argument about height affecting attachment strength, Velcro argued that "[t]his reasoning wanders from considering the invention as a whole, and concludes that the quantified parameter is result-effective if any one of its constituent parts is result-effective."  Appx217.  Velcro added: "But if that were the proper standard, the court in *In re Antonie* would have reached the opposite conclusion because one of the two constituent parts of the ratio—the contactor area—was known from [the prior art] to be result-effective."  *Id.*

16

Velcro disputed the examiner's "assertion that '[Tuma] has the claimed features to meet the claimed elements,' at least if this assertion suggests more than that [Tuma] discloses three-dimensional mushroom-type fastener elements that must have some dimensions." Appx219 (footnote removed). "There is insufficient information in [Tuma] to determine most of the dimensions that would be required to calculate the constituent parts of the claimed parameters, even in one example." *Id.*

### B.    Velcro Appealed to the Board

On appeal to the Board, Velcro identified the legal errors in the examiner's reasoning behind the final rejection. *See* Appx234-41.[5] Velcro explained that Tuma teaches "detachably adhering to another component by means of adhesive force such as Van der Waals forces." Appx234 (internal citations removed). Velcro challenged the examiner's assertion that fastener height is known to be a result-effective parameter, explaining that "Tuma says nothing about fastener element height as being of any effect on the 'adhesive force' or any other result parameter." Appx237. Velcro also highlighted the examiner's legal error in his conclusion that a quantified parameter (such as the claimed ratios) is result-effective if any one of the constituent parts is result-effective. Appx237-39.

---

[5] After a notification of non-compliance, the applicant submitted a new "(3) Claimed Subject Matter" section of its appeal brief citing page and line numbers as opposed to paragraphs from the publication. Appx261-64.

Velcro cited two paragraphs related to the significance of each of certain parameters.  Appx233 (citing Appx51 (9:23-29) for Edge Flex Ratio and Appx50 (8:5-17) for Stem Bending Coefficient); Appx50 (8:5-17) ("We have observed how readily the above-described flat-topped mushroom fastener elements can bend in response to lateral loads applied to the head, such as by a finger applying light pressure as it moves across the field[.]"); Appx51 (9:23-29) ("FIG. 10 also illustrates that the edge of the fastener element head can flex upward in response to a fiber-applied point load[.]").

Finally, Velcro argued that it was under no burden to show criticality for the claimed parameter ranges because it had not been shown that the recited parameters were known to be result-effective.  Appx240-41.  Velcro argued that "there has been no evidence presented to show that the recited parameters were even considered in the prior art, much less recognized to be result-effective." *Id.* Velcro continued that "[n]or is there any reason derived from the prior art, before Appellants' disclosure, to suspect that the particular combination of such disparate measurements as the difference between overall lateral extent of the head and the minimum lateral extent of the stem, the overhang midpoint thickness, the overall height and the bend height would be effective as to any desired result."  Appx240.

In response, the examiner annotated Tuma's Figure 3 to draw what he claimed to be the dimensions related to the claimed ratios (as shown below with

dotted lines) to attempt to demonstrate that Velcro's invention would have been

obvious considering Tuma.



Appx274 (Tuma Fig. 3 with enhanced contrast from the original version and

annotations added by examiner highlighted in yellow).

The examiner argued that "it would have been obvious to one of ordinary

skill in the art before the effective filing date that a longer stem, increasing length

alone, would result in a weaker attachment between fastener elements."  Appx276.

The examiner also noted that "the rejection did not rely explicitly on fastener

height; the rejection relied on [the theory that] it would have been obvious to have

changed numeric values of the variables in order to adjust attachment/separation

force."  *Id.* (citing Appx209-10).  The examiner argued that Tuma discloses

"Appellant's parameters and the Examiner's position is that it is known in the art

to modify shapes of fastener heads in order to enhance/decrease the adhesive force of the object." Appx276; Appx278.

In its Reply, Velcro argued that Tuma does not disclose all of the variables needed to calculate the claimed ratios. *See* Appx237; Appx281. Velcro alleged that the Examiner merely "guessed" at the location for determining the dimension "J" as there is no discussion in Tuma regarding this measurement. Appx281. Velcro explained that, if the examiner's position about the general structure being disclosed in the prior art were sufficient for obviousness, then *Antonie* "would have come out the other way." Appx282. Velcro also argued that the parameters recited with numerical ranges in the rejected claims have not been shown to be result-effective. *Id.* Velcro argued that if the examiner's REV analysis were correct, then "no advance in fastener element shape would ever meet the test for patentability" and "there have been all sorts of changes in fastener element design to impact fastening performance, but ***none of these additional citations gets any closer to showing that the specific parameters [Velcro] has recited in the rejected claims have been recognized as being of any relevance to any ascertainable result***." Appx282-83 (original emphasis). Therefore, the examiner had not met his burden to show a *prima facie* case of obviousness. Appx283.

During oral argument, Velcro's counsel emphasized the importance of the Edge Flex Ratio—this ratio is the way the inventors found to describe "the

phenomenon that has to do with how well the edge of this head flexes when there

is an engaged fiber that's being pulled off." Appx308 at 17-19. Counsel added

that the Stem Bending Coefficient "is a dimensionless parameter that gets into how

likely the stem will bend in that same scenario." *Id.* at 23-25. In this industry,

"there are some very specific resins [sic] that end up having to be used for

durability and strength and things like that." Appx309 at 1-2. In describing a

claimed ratio, counsel explained how the claimed ratios capture the advantageous

"relative flexibility" that the inventive fastener elements provided:

> The ratio, they call Edge Flex Preference, and that relates to the ***relative flexibility*** of the head and stem. So, the higher the number, the more the edge will flex itself before the stem bends over to help align the load and prevent release.
>
> So, going back a few years in fastener element science, you know, when molded fastener elements first came out, they were essentially J-hooks or palm trees, where there was a molded crook. And you would engage a fiber. And when you were releasing, the crook had to deflect to let the fiber out, before the fiber broke. You wouldn't want the fiber to break if you wanted a long-life fastener product. So there was that kind of motion.
>
> With mushroom type elements like these, especially thin-edge rim, you know, flat-top mushroom elements, which is one of many in the field now, this is sort of part of the realization underlying the invention that these ***two relationships of flexure***, are critical.

Appx309 at 11-25. When asked about whether Velcro was the only one using

Edge Flex Ratio, counsel explained that the inventors used this ratio to capture the

innovation they had achieved:

> When the inventors started their development, and they were observing things in the lab, and they tried to figure out what was really going on and what was important, they had to coin these terms to explain what they came up with, because those **concepts had not been recognized in the art**. So, we had to, and we did reduce those to specific equations, you know, essentially, written out into the claims of these five specific dimensions, in the figures of H and J and S, CT and C. All of those get pulled into these two overall parameters that are then, affecting the product and the ratio.

Appx310 at 4-13.

The Board expressed a concern that the application was "creating a new parameter, based on dimensions that were never previously explicitly defined in the art, you're just appreciating something that was already inherent." Appx316 at 21-24. In response, Velcro's counsel explained that not all effective fastener elements would practice this recited parameter and that "[f]astener elements are used for very different reasons, for different types of fastening, and the claim, Claims 19 and 33 do not cover the field." Appx317 at 6-8.

## C.     The Board's Final Written Decision

The Board affirmed the examiner's rejection. Appx2; Appx15. The Board selected claim 19 as representative and admitted that the examiner did not suggest, let alone prove, that the ratio of Edge Flex Ratio to Stem Bending Coefficient is "inherent or necessarily follows from explicit teachings in Tuma." Appx4; Appx13. "Rather, the Examiner's rejection is based on the obviousness of modifying Tuma's device (*see* Tuma Fig. 3) to increase or decrease

22

attachment/separation forces, thereby arriving at the claimed ratio of Edge Flex Ratio to Stem Bending Coefficient." Appx13. The Board found that "(i) the overall lateral extent of the head and (ii) fastener height are known to affect attachment/separation force." Appx7.[6] Because these values are inputs for the claimed "ratio of Edge Flex Ratio to Stem Bending Coefficient," the Board found that this ratio is "a variable that can be adjusted by one of ordinary skill in the art to determine a workable or optimal ratio based on a desired application of the fastener." Appx8 (citing *In re Applied Materials*, 692 F.3d 1289, 1297 (Fed. Cir. 2012)).

The Board distinguished *Antonie* because there "the prior art did not even recognize that one of the variables in the ratio was relevant to the desired property." Appx10. "In contrast, here, the prior art and the knowledge of one of ordinary skill in the art evidences a recognition that changes in certain dimensions of a male touch fastener appearing in both the numerator and denominator of the

---

[6] The Board found that Tuma discloses varying "cap surface area." Appx7-8; *see also* Appx7 (accepting the examiner's finding that a POSITA "would have recognized that at least cap surface area … and fastener height would affect attachment/separation force"). The Board also found that "cap surface area" is "directly related to overall lateral extent of the head" which is **C** in the '188 application's parlance. Appx7; Appx5 (describing **C** as overall lateral extent of the head). Cap surface area = $(\pi)(r)^2$. Because the cap's radius is half its diameter, cap surface area is $(\pi)(\textbf{C}/2)^2$ in the parlance of the '188 application.

claimed ratio will have an effect on the result of the attachment/separation force." *Id.*

## <u>SUMMARY OF THE ARGUMENT</u>

The Board erred in affirming an obviousness rejection using an incorrect legal standard for result-effective variables which fails to properly analyze the invention as a whole. In doing so, the Board used both the wrong "variable" and the wrong "result." Each of these errors independently requires reversal. The Board's identified "variable" and "result" from Tuma are different from the claimed subject matter and a person of ordinary skill in the art ("POSITA") would not have been motivated with a reasonable expectation of success to bridge the admitted gaps in Tuma to arrive at the claimed ratios. The Board thereby fundamentally misunderstood the logic behind the REV doctrine and the way it may contribute to the obviousness determination more generally.

Additionally, the Board's finding that the claimed ratios are result-effective variables is not supported by substantial evidence. The Board relies entirely on impermissible hindsight where the prior art, at best, discloses only a broad range that does not invite routine optimization.

This Court should reverse the Board's decision and hold that the claims would not have been obvious under <u>35 U.S.C. § 103</u>.

## **STANDARD OF REVIEW**

This Court reviews the legal determinations made by the Board *de novo* and the factual determinations of the Board for substantial evidence.  *See, e.g.*, *Applied Materials*, 692 F.3d at 1297.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. N.L.R.B*, 305 U.S. 197, 229 (1938).

"Obviousness is a question of law with several underlying factual inquiries, including what a reference teaches."  *Applied Materials*, 692 F.3d at 1294.  This Court has treated whether variables are result-effective as a question of fact, reviewed for substantial evidence.  *E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1009 n.14 (Fed. Cir. 2018) ("We assume, without deciding, that whether a variable was recognized as result-effective is a question of fact."); *Applied Materials*, 692 F.3d at 1295.[7]  Where "the Board did not apply the proper legal standard for result-effective variables," the Court has set aside the analysis as lacking substantial evidence.  *E.I. DuPont*, 904 F.3d at 1009-10 ("No substantial evidence supports the Board's contrary finding that it made under the wrong legal

---

[7] As discussed below, the Court should reverse the Board's decision because substantial evidence does not support the Board's finding that the claimed ratios are result-effective variables under the proper legal standard for a REV analysis. Under *de novo* review, the Court should also reverse.

standard.  On the record evidence, only one finding was permissible: temperature and PO2 were recognized as result-effective variables.").

## ARGUMENT

The Board did not find that Tuma explicitly or inherently satisfies the claimed ratios.  *See* Appx13 ("We note that this [sic] not a case where the Examiner is suggesting that there is a specific example in Tuma in which the ratio of Edge Flex Ratio to Stem Bending Coefficient is inherent or necessarily follows from explicit teachings in Tuma.").  There is thus a clear gap between the prior art and the claims of the '188 application, which the Board filled through a misapplication of the REV doctrine.

This Court should reverse the Board's decision because substantial evidence does not support the Board's findings where (1) it applied the incorrect legal standard in its REV analysis and (2) the prior art's disclosure is akin to a broad range that does not invite routine optimization.

## I.   THE BOARD ERRED IN ITS RESULT-EFFECTIVE VARIABLE ANALYSIS BY FAILING TO APPLY THE PROPER LEGAL STANDARD

### A.   The REV Doctrine Requires Determining Whether the Claimed Variable and Its Corresponding Result Are Recognized in the Prior Art

An optimizable parameter or variable known to produce a certain result is called a "result-effective variable."  The REV analysis typically arises in relation to

chemical patents for explaining the obviousness of a "process parameter, such as temperature." *See, e.g., Genentech, Inc. v. Hospira, Inc.*, 946 F.3d 1333, 1341 (Fed. Cir. 2020).  In these situations, "where the prior art recognizes that the process parameter affects the relevant property or result, then the process parameter is 'result-effective.'" *Id.*  When properly applied, the REV analysis can be used to satisfy the *prima facie* case of obviousness or invoke a "presumption of obviousness." *Id.*

More generally, the REV analysis is merely one aspect of a "broader routine optimization analysis." *Pfizer Inc. v. Sanofi Pasteur Inc.*, 94 F.4th 1341, 1347 (Fed. Cir. 2024).  "A routine optimization analysis generally requires consideration of whether a [POSITA] would have been motivated, with a reasonable expectation of success, to bridge any gaps in the prior art to arrive at a claimed invention." *Id.* at 1348.  This theory of obviousness is "rooted in the decades-old legal principle that 'where the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation.'" *Id.* at 1347 (quoting *Aller*, 220 F.2d at 456).

Conversely, a POSITA "would not always be motivated to optimize a parameter 'if there is no evidence in the record that the prior art recognized that [that] particular parameter affected the result.'" *E.I. DuPont*, 904 F.3d at 1008 (quoting *Antonie*, 559 F.2d at 620).  Therefore, when there is "no disclosure of the

relationship between the variable and the result in the prior art," a variable is not result-effective. *Applied Materials*, <u>692 F.3d at 1297</u> (citing *Antonie*, <u>559 F.2d at 620</u> and *In re Yates*, <u>663 F.2d 1054</u> (C.C.P.A. 1981)).

   *Antonie* demonstrates that the proper analysis requires looking at the ***claimed*** variable and its corresponding result.  In *Antonie*, the appellant claimed a wastewater treatment device including limitations with a ratio of tank volume to contactor area of 0.12 gal./sq. ft, which the patent explained maximizes "treatment capacity."  <u>559 F.2d at 619</u>.  The prior art taught the basic structure of the claimed device but was silent regarding quantitative design parameters other than to give data on a single example, which did not have any discussion of "tank volume."  *Id.* The prior art also disclosed that "efficiency" (not "treatment capacity") could be increased to 95% by increasing the area of the contactor.  *Id.*  The examiner had rejected the claims because he assumed that the prior art "teaches keeping the tank volume constant while increasing the contactor area" and, therefore, "the idea of increasing tank volume to surface area to increase ***efficiency*** is taught."  *Id.*

$$"ratio\ of\ tank\ volume\ to\ contactor\ area" = \frac{\text{Tank Volume}}{\text{Contactor Area}}$$

   In reversing the unpatentability decision, the court explained that a proper obviousness analysis requires looking at the invention "as a whole."  *Id.* at 619.  "In delineating the invention as a whole, we look not only to the subject matter which is literally recited in the claim in question (the ratio value) but also to those

28

properties of the subject matter which are inherent in the subject matter and are disclosed in the specification." *Id.* (citing *In re Davies*, 475 F.2d 667 (C.C.P.A. 1973)). The court held that "the invention as a whole is the ratio value of 0.12 ***and its inherent and disclosed property*.**" *Id.* In the subject application, the disclosed property was that "the described devices designed with the ratio will maximize treatment capacity regardless of the values of the other variables in the devices." *Id.* Therefore, "[t]he controlling question is simply whether the differences (namely the value of 0.12 and its property) between the prior art and appellant's invention as a whole are such that appellant's invention as a whole would have been obvious." *Id.* at 620.

The court reversed and held that "[i]t is impossible to recognize, from the experiment taught by [the prior art], that 'treatment capacity' is a function of 'tank volume' or the tank volume-to-contactor area ratio." *Id.* The court added that "[r]ecognition of this functionality is essential to the obviousness of conducting experiments to determine the value of the 'tank volume' ratio which will maximize treatment capacity." *Id.* The prior art's benefit of "efficiency" did not make the claimed ratio a result-effective variable with respect to the benefit of the new application ("treatment capacity") because optimizing for that different benefit ("efficiency") would not lead to the claimed ratio. *See id.* at 620 n.4 ("Assuming, as the examiner has, that the tank volume is fixed and the natural motivation is to

29

maximize efficiency, if [the prior art]'s equipment has a tank volume to contactor area ratio of less than 0.12, and the resulting efficiency is found wanting, increasing the contactor area to increase 'efficiency' will lead away from the claimed ratio.").

*Antonie* underscores that the obviousness presumption derived from a proper REV analysis cannot be applied in isolation.  Rather, it must be grounded in the broader obviousness inquiry—specifically, whether a POSITA, considering the invention as a whole, would have been motivated to arrive at the claimed optimized range.  Indeed, this Court recently confirmed "the premises on which the presumption rests properly guide whether it should be held to apply in a given setting."  *Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*, No. 2025-1228, 2025 WL 1874090, at *6 (Fed. Cir. July 8, 2025).  As the Court explained, "[t]hose premises are factual ones about relevant artisans' motivations to optimize and expectations from routine experimentation—which, not surprisingly, are materially the same as the basic factual inquiries of the normal full obviousness analysis (motivation to combine or modify and expectation of success) that the presumption, when applicable, replaces."  *Id.*  Therefore, where the fact-findings are insufficient, "the proper course . . . is to apply the normal full obviousness analysis, rather than a truncated version based on the invoked presumption."  *Id.* at *8.

Here, similar to *Antonie*, the Board erred in identifying both the variables and the results for its REV analysis.

### B.    The Board Erred in Identifying the "Variable" for Its REV Analysis

#### 1.    The Board Did Not Use the Claimed Ratios as the "Variable"

The claimed ratios here rely on specific mathematical relationships between five different measurements: height perpendicular to the base sheet **H**, bend height **J**, nominal diameter of the stem **S**, diameter of the head **C**, and a head thickness **CT**.[8]  *See* Appx49 (7:22-10:28).  The Board notably did not find that Tuma teaches, or that a POSITA's background knowledge includes, these claimed ratios. *See* Appx7; Appx13.

Instead, the Board identified two of the five measurements (height **H** and head diameter **C**) as affecting attachment/separation force and cited a POSITA's potential desire to increase or decrease attachment/separation force as motivation to optimize these two variables (**H** and **C**) to arrive at the claimed ratios.

$$Edge\ Flex\ Preference = \frac{EF}{SB} = \frac{\frac{C - S}{CT}}{\frac{H - J}{S}}$$

*See* Appx7-8; Appx15.  This approach erroneously dispenses with the requirement that the claimed ratio itself be disclosed in the prior art.  Indeed, *Antonie* explained

---

[8] EF = (**C**-**S**)/**CT**; SB = (**H**-**J**)/**S**.

that such an approach is incorrect because it would be "impossible to recognize" a result being "a function" of the ***ratio*** (or even the other ignored variables). *Antonie*, <u>559 F.2d at 620</u>.[9]

Furthermore, the phenomenon described in the '188 application relates to the moment arm between the upper surface of the fastener element and its preferred bending point near the base of the stem (**H**-**J**) and not just height (**H**) itself. Similarly, the '188 application describes benefits relating to the amount of overhang (related to **C**-**S**), *see* <u>Appx50-51</u> (8:28-9:6), and not just the overall lateral extent of the head (**C**), on which the Board relied. The Board therefore erred in finding that the ***claimed ratios*** are result-effective variables based on its conclusion that ***only parts*** of the ratios (**H** and **C**) affect a certain result (attachment/separation force).

This error directly parallels the Board's error in *Antonie*. <u>559 F.2d at 620</u>. In *Antonie*, the prior art reference taught "increasing the 'efficiency' (degree of purification) of his device by increasing the contactor area while apparently keeping the 'throughput' constant," which the examiner assumed meant that the prior art reference taught "keeping the tank volume constant while increasing the contactor area." *Id.* at 619. The *Antonie* court faulted the Board for failing to

---

[9] In *Antonie*, the court explained that "[r]ecognition of this functionality is essential to the obviousness of conducting experiments to determine the value of the . . . ratio which will maximize" its disclosed property. <u>559 F.2d at 620</u>.

consider the claimed invention as a whole. *Id.* The *Antonie* court explained that it was "impossible to recognize, from the experiment taught by [the prior art], that 'treatment capacity' is a function of 'tank volume' or the tank volume-to-contactor area ratio" because such variables of "tank volume" and "tank volume-to-contactor area ratio" were not disclosed in the prior art. *Id.* at 620. Thus, the *Antonie* court found that the prior art "[did] not reveal the property which applicant has discovered," and reversed the Board's decision. *Id.* at 620. The Board here similarly erred in determining the claimed ratios are result-effective variables.

$$\textit{"ratio of tank volume to contactor area"} = \frac{\text{Tank Volume}}{\text{Contactor Area}}$$

The requirement to look to the "invention as a whole" is not limited to *Antonie* and is key to the obviousness analysis. *See* 35 U.S. Code § 103 ("A patent for a claimed invention may not be obtained . . . if the differences between the claimed invention and the prior art are such that the claimed ***invention as a whole*** would have been obvious."). This Court has confirmed that, "mere identification in the prior art of each element is insufficient to defeat the patentability of the combined subject matter as a whole." *In re Kahn*, 441 F.3d 977, 986 (Fed. Cir. 2006).[10] The Board here erred in determining the claimed ratios are result-

---

[10] The importance of the invention as a whole similarly arises in written description and patent eligibility. *See Novozymes A/S v. Dupont Nutrition Biosciences APS*, 723 F.3d 1336, 1346 (Fed. Cir. 2013) ("Taking the claims as a

effective variables by ignoring the invention as a whole and instead focusing on some of the individual dimensions without regard to all the relationships between them.

### 2. The Board Failed To Find That All the Parameters Are Result-Effective

Although the Board found that Tuma's Figure 3 teaches the fastener dimensions used to calculate the claimed ratios generally (without providing specific values for any of the dimensions), the Board did not find that ***all of those dimensions*** are result-effective variables. *See ModernaTx, Inc. v. Arbutus Biopharma Corp.*, 18 F.4th 1364, 1376 (Fed. Cir. 2021) ("[E]ven if we accepted Moderna's argument that the phospholipid range is a result-effective variable, we would have to conclude based on the record that the other lipid components in the prior art nucleic acid-lipid particles are result-effective variables. Then the question would be whether Moderna showed that reaching the claimed ranges for these result-effective variables would have been achievable through routine optimization."). The Board recognized that, in *Antonie*, the prior art also did not disclose a recited ratio, but attempted to distinguish *Antonie* because there "the

---

whole rather than as the sum of their individual limitations, nothing in the 2000 application indicates that Novozymes then possessed what it now claims."); *Bilski v. Kappos*, 561 U.S. 593, 611 (2010) ("Diehr emphasized the need to consider the invention as a whole, rather than 'dissect[ing] the claims into old and new elements and then . . . ignor[ing] the presence of the old elements in the analysis.'").

prior art did not even recognize that one of the variables in the ratio was relevant to a desired property." Appx10. Only by disregarding some dimensions (CT, J, and S) and arbitrarily selecting others (H and C) did the Board find that a POSITA would have optimized attachment/separation force by varying certain parameters.

For example, the Board did not even discuss whether cap thickness (CT),[11] which is a part of the claimed ratios, has any relationship to "attachment/separation force." Appx7. Tuma teaches a desire to "enhance the adhesion and separation properties" by changing the "effective size of the contact surface for the corresponding head part." Appx351 at [0004]-[0005]. Tuma says nothing about varying cap thickness (CT) for a desired result. Tuma also does not teach keeping cap thickness (CT) constant while varying the two dimensions the Board selected (H and C) so that a POSITA could theoretically achieve the claimed ratios in the '188 application. *See Antonie*, 559 F.2d at 620 (noting that the recognition that a result "is a function" of the variable is "essential" for conducting experiments to optimize that variable). This failure to identify any relationship between the other variables in the claimed ratios and the alleged result of "attachment/separation force" is a fatal omission in the Board's REV analysis.

---

[11] More specifically, the '188 application defines cap thickness (CT) as the thickness measured "parallel to the stem at a midpoint of the overhand distance OH." Appx51 (9:1-2).

### 3. Reversing the Board's Decision Will Promote Consistency Before the Agency

The Board's decision here cannot be squared with other Board decisions which correctly require a showing that the "parameter [ratio] and its claimed range were technical design considerations or parameters that a [POSITA] would have recognized or considered." *Gen. Elec. Co. v. United Techs. Corp.*, IPR2018-01123, Paper 8 at 19-20 (PTAB Nov. 29, 2018); *see also Ex parte Levasseur*, Appeal 2021-001420 at 6 (PTAB Oct. 21, 2021) ("However, the fact that fan blade count may be a result-effective variable does not, without further findings or explanation, show that the claimed ratio, which relies on both fan blade count and turbine rotor count, was itself recognized as a result-effective variable."); *Gen. Elec. Co. v. Raytheon Techs. Corp.*, IPR2020-00346, Paper 9 at 24-25 (PTAB June 23, 2020); *Ex. Parte Bouldin*, Appeal 2019-005707 at 7-8 (PTAB Apr. 23, 2020); *Gen. Elec. Co. v. United Techs. Corp.*, IPR2019-00213, Paper 12 at 13 (PTAB May 13, 2019) (stating the petitioner must "show that the EUTP ratio as a whole as recited in claim 19 was a known result-effective variable and not that just one or more of the parameters comprising EUTP was a known result-effective variable").

To promote consistency in the Patent Office's application of the REV doctrine to claimed ratios, this Court should reverse the Board's decision rejecting Velcro's claims.

**C.    The Board Erred in Identifying a "Result" for Its REV Analysis**

The Board failed to explain how a POSITA would have arrived at the claimed ratios based on the "result" it identified.  This error is an independent reason to reverse the Board.  Specifically, the Board found that the claimed ratios were result-effective variables based on a result disclosed in Tuma instead of a result taught in the '188 application.  Appx6 ("Tuma teaches that it is known that some portions can have a weaker separation force . . . while other portions require a stronger separation force." (internal quotation omitted, ellipses in original)).  However, one must consider the invention as a whole in the REV analysis and, "[i]n delineating the invention as a whole, we look not only to the subject matter which is literally recited in the claim in question (the ratio value) but also to those properties of the subject matter which are inherent in the subject matter and are disclosed in the specification."  *Antonie*, 559 F.2d at 619.

The '188 application discloses fastener elements having improved "softness to the human touch" such that it is "difficult for a layperson to tell which side of the sheet is the fastening surface."  Appx46-47 (4:29-5:3); *see also* Appx56 (14:3-23).  In addition, the inventive fastener elements can be formed at "very high speeds in the production of inexpensive fastener products."  Appx46-47 (4:29-5:3).  The '188 application further teaches that the inventive fastener elements are "advantageously flexible in multiple modes in response to a laterally applied head

load," Appx52 (10:10-21), and describes optimizing both Total Flexure Product
(SB*EF, one of the claimed ratios) and the Edge Flex Preference (EF/SB, the other
claimed ratio), which "relates to the relative flexibility of head edge and stem."
Appx52 (10:10-28).

Rather than looking at these characteristics, the Board focused on modifying
two fastener element dimensions to optimize for a different result—namely,
"attachment/separation force." Appx11. The Board pulled this result from Tuma's
disclosure of solutions to "enhance the adhesion and separation properties of the
touch-and-close fastener." *See* Appx351 at [0003]-[0004]. Importantly, Tuma
does not disclose either a desire for or means to achieve "softness to the human
touch" or optimal Total Flexure Product and/or Edge Flex Preference. Therefore,
Tuma does not disclose any relationship between attachment/separation force and
the result that the '188 application teaches the claimed invention achieves (e.g.,
softness to touch). Tuma likewise does not disclose any relationship between the
'188 application's taught result and the variables on which the Board relied in its
analysis (cap surface area and fastener height). *Applied Materials*, 692 F.3d at
1297 (noting as relevant to the REV inquiry "no disclosure of the relationship
between the variable and the result in the prior art"); *see* Appx232; Appx238-39.

Furthermore, the Board failed to explain why the "attachment/separation
force" it cited from Tuma was related to ***any*** specific teaching in the '188

application.  Tuma describes that "[c]ontact surfaces in a magnitude of 0.2 to

0.5μm$^2$ enable an interaction with a corresponding additional component . . . , to

which the touch-and-close fastener part is to be secured by means of the so-called

Van der Waals interaction[.]" Appx351 at [0003].[12]  In contrast, the '188

application is directed at a releasable engagement achieved either by interlocking

with other male fastener elements or through a "snag and retain" mechanism

involving "extremely fine" fibers—"particularly useful in snagging very low-loft

knit materials, such as those formed of cotton or silk." Appx48 (1:11-14); Appx48

(6:12-15).  The Board provided no reasoning as to why a shape optimized for

"attachment/separation force" in the context of Van der Waals interactions would

also be optimal for the mechanically based releasable engagement described in the

'188 application, which does not mention or rely on Van der Waals forces.

Similar to the Board's error in *Antonie*, the Board here confused the "result"

of the prior art with the "result" of the '188 application without finding a

relationship between the two results.  In *Antonie*, the Board erred when it relied on

the prior art's teaching about optimizing a variable for "efficiency" instead of the

new application's claimed range optimized for "treatment capacity." *See Antonie*,

559 F.2d at 620.  The court explained that (1) the prior art had to recognize that the

---

[12] Van der Waals interaction "is considered to be in classical terms a subgroup of adhesion." Appx351 at [0003].

result achieved by the claimed range was a function of the claimed variable and (2) such recognition was "essential to the obviousness of conducting experiments to determine the value of the 'tank volume' ratio which will maximize treatment capacity." *Id.*; *see id.* ("This sort of experiment would not be suggested by the teachings of [the prior art] since he was not trying to maximize or control 'treatment capacity.'").  In other words, in *Antonie*, there was no evidence showing that optimizing for "efficiency" would have arrived at the claimed range, which the inventors discovered by optimizing for the different result of "treatment capacity."

Here, the Board found that the prior art and a POSITA's background knowledge collectively suggest conducting experiments to determine values of the overall lateral extent of the head (**C**) and fastener height (**H**) to optimize or obtain desirable attachment/separation force.  Appx11.  The Board then assumed that optimizing the attachment/separation force will consequently produce the optimal and/or desirable ratio of Edge Flex Ratio to Stem Bending Coefficient (EF/SB, i.e., Edge Flex Preference) which is taught by the '188 application.  Appx11-12.  The Board cited no evidence that optimizing for attachment/separation force "will consequently result in a corresponding optimized and/or desirable ratio of Edge Flex Ratio to Stem Bending Coefficient," *id.*, which the inventors here discovered by optimizing for a different result.  In fact, the Board carefully avoided making a finding that a POSITA would arrive at the claimed range for each claimed ratio.

40

Specifically, the Board found only that changing the parameters for attachment/separation force would also change the ratio itself, *see, e.g.*, Appx11-12,[13] or made conclusory findings that a POSITA would arrive at the claimed ratio of Edge Flex Ratio to Stem Bending Coefficient ***without addressing the claimed range***, *see* Appx13.[14]  Without providing any logic for how a POSITA would have arrived at the claimed range of the ratio when optimizing parameters for a different result, the Board's logic fails to satisfy all the claim elements of the invention, similar to the Board's error in *Antonie*.  *See Antonie*, 559 F.2d at 620 (noting the Board's error by relying on "efficiency" rather than "treatment capacity").

Under the proper REV analysis, the Board's decision cannot stand.  The Board admitted that the "the ***claimed ratio*** of independent claim 19 appears to be ***directed toward*** identifying particular values that may represent a ***desirable combination . . . relating to male touch fasteners' flexibility***." Appx14.  Yet, the Board did not explain how a POSITA would obtain this "desirable" feature related to "flexibility" based on Tuma and even admits that "the prior art is not necessarily

---

[13] "[T]he prior art . . . suggest conducting experiments to determine the values of the overall lateral extent of the head and fastener height which will result in an optimized and/or desirable attachment/separation force, which will consequently result in a corresponding optimized and/or desirable ratio of Edge Flex Ratio to Stem Bending Coefficient." Appx11-12.

[14] "Rather, the Examiner's rejection is based on the obviousness of modifying Tuma's device (*see* Tuma Fig. 3) to increase or decrease attachment/separation forces, thereby arriving at the claimed ratio of Edge Flex Ratio to Stem Bending Coefficient." Appx13.

concerned with understanding whether a cap edge will flex before a stem."
Appx14 (citing Appx52 (10:22-26)).  Instead, the Board merely wrote off the
claimed ratios as result-effective variables because a different "result"
(attachment/separation force) would change when certain parts of the ratio (overall
lateral extent of the head (**C**) and fastener height (**H**)) changed.  Appx15.  The
Board's finding that the claimed ratios are result-effective variables should be set
aside.

### D.    The Court Should Reverse the Board's Erroneous Application of the REV Doctrine

The Board's rigid misapplication of REV is not faithful to this Court's
precedent and strays from the logic supporting the REV doctrine.  As such, the
Board's approach here effectively short circuits the requirements of *Graham* and
routine optimization precedent as the Board ***never*** explains how a POSITA "would
have been motivated, with a reasonable expectation of success, to bridge any gaps
in the prior art to arrive at" the preferred claimed ratios.  *See Pfizer*, 94 F.4th at
1348.

In other words, neither the examiner nor the Board provided any explanation
of how it would have been routine optimization for a POSITA to reach the
preferred Edge Flex Preference of between "0.3 and 6.0" after starting with Tuma
and optimizing it for attachment/separation force.  Indeed, the Board admitted that
such an optimization would "arrive at" only a "desired attachment/separation

force" and not the preferred range for the claimed ratios.  Appx12 ("[T]he Examiner's rejection is based on the obviousness of changing specific dimensions (e.g., overall lateral extent of the head and fastener height) to ***arrive at a desired attachment/separation force***, which will necessarily result in changing the claimed ratio of Edge Flex Ratio to Stem Bending Coefficient to be greater or smaller."); Appx12 (discussing "modifying Tuma so as to arrive at a particular desired attachment/separation force"); Appx12 ("[T]o increase attachment/separation force is plausible depending on the desired end result[.]").  However, there is no reason from the art to believe that, at the desired attachment/separation force, the resulting ratio of Edge Flex Ratio to Stem Bending Coefficient would be within the claimed range.

The Board's analysis of claim 33 and its preferred range of between 3.0 and 10.0 for the Total Flexure Product ("SB*EF") is even more deficient.  Namely, the Board held that claim 19 was a "representative claim" and ***did not address the limitation in claim 33***.  Appx4.  The Board did not even try to explain its conclusory theory with respect to **H**, **C**, and optimizing for "attachment/separation force" in the context of the Total Flexure Product.

$$Total\ Flexure\ Product = SB * EF = \frac{H-J}{S} * \frac{C-S}{CT}$$

The Board's complete disregard for the language of the claims shows that its REV analysis is defective.  *See Antonie*, 559 F.2d at 619 (looking "to the subject matter which is literally recited in the claim in question (the ratio value)").

Applying the proper legal standard, the record supports only one conclusion—the claimed ratios were not considered result-effective variables. Therefore, the Court should reverse the Board's decision.  *See Corning v. Fast Felt Corp.*, 873 F.3d 896, 901-02 (Fed. Cir. 2017) ("[W]here only one answer is supported by substantial evidence and there is neither a request nor an apparent reason to grant a second record-making opportunity, reversal is warranted."); *see also E.I. DuPont*, 904 F.3d at 1006 (reversing where "on the record evidence, only one finding was permissible").  At a minimum, the Board's decision should be vacated.

## II.    SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE BOARD'S DECISION BECAUSE TUMA'S DISCLOSURE IS AKIN TO A BROAD RANGE THAT DOES NOT INVITE ROUTINE OPTIMIZATION

Even overlooking the Board's legal errors, substantial evidence does not support the Board's finding that a POSITA would have been able to discover the ranges of the claimed ratios, *see* Appx12, because Tuma does not disclose any values for the dimensions of its fastener elements (which the Board acknowledged) and there are too many parameters to test.

44

In the context of a more specific application of the REV doctrine, this Court has explained that "[a] *prima facie* case of obviousness typically exists when the ranges of a claimed composition overlap the ranges disclosed in the prior art." *E.I. DuPont*, 904 F.3d at 1006 (quoting *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003)).  A patentee may rebut such a *prima facie* obviousness determination in four ways:

> First, a modification of a process parameter may be patentable if it "produce[s] *a new and unexpected result* which is different in kind and not merely in degree from the results of the prior art." *Aller*, 220 F.2d at 456.  A claimed range that demonstrates such unexpected results is referred to as a "critical" range, and the patentee has the burden of proving criticality. *Id.*
>
> []
> Second, and relatedly, a patentee may rebut the presumption of obviousness by showing that the prior art *taught away from the claimed range*. . . . .
>
> []
> Third, a change to a parameter may be patentable if the parameter was *not recognized as "result-effective."* . . . . But "[a] recognition in the prior art that a property is affected by the variable is sufficient to find the variable result-effective." . . . .
>
> []
> Fourth, we have reasoned that *disclosure of very broad ranges may not invite routine optimization*. *Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d 1291, 1306 (Fed. Cir. 2011) (holding that ordinary motivation to optimize did not apply where disclosure was 68,000 protein variants including 2,332 amino acids); . . . .

*E.I. DuPont*, 904 F.3d at 1006 (internal citations omitted).

Although these ways to rebut the *prima facie* case were discussed in the context of overlap in claimed and prior art ranges, each of these paths should be

available to rebut any *prima facia* showing based on the REV doctrine.  *Cf. Pfizer*, 94 F.4th at 1348 (rejecting the argument that "determination whether or not a variable is result-effective is only appropriate when there is such an overlap").

Here, the Board treated Tuma as disclosing all ranges for the dimensions of lateral extent of the head (**C**) and fastener height (**H**).  *See* Appx12 (suggesting that the lateral extent of the head and fastener height could be modified to reach any ratio of Edge Flex Ratio to Stem Bending Coefficient).  But this analysis ignores the excessive number of parameters that must be optimized to reach the preferred ranges of the claimed ratios.

First, Tuma does not disclose starting dimensions required to calculate the claimed ratios for the embodiment of Figure 3.  Tuma does not even explicitly contemplate some of the measurements used in the claimed ratios such as the thickness of the fastener element's head (**CT**) and the bend height (**J**).  *See* Appx346-53.  Instead, the examiner merely annotated these dimensions onto Tuma's Figure 3.  Appx274.

Tuma's failures in this regard are especially problematic because the claimed ratios involve multiple parameters—fastener height (**H**), nominal stem diameter (**S**), head diameter (**C**), head thickness (**CT**), and bend height (**J**).



Appx30 (Fig. 7) (annotations added); Appx30 (Fig. 6) (annotations added).

Tuma's failure to disclose starting points for so many parameters compounds the high degree of experimentation needed to arrive at the claimed ratios.

Second, Tuma does not contemplate the ***relationships*** between the parameters taught in the '188 application. *See* Appx346-53. Specifically, although the examiner drew lines on Figure 3 from Tuma for certain dimensions, he did not explain how a POSITA would have recognized the various characteristics that arise from the relationships between the specific parameters taught in the '188 application. As shown below, these relationships build on each other to reach the final claimed ratios.

| Parameter Relationship | Disclosed Range | Description in the '188 application |
|---|---|---|
| (**H**-**J**) | H = 0.126-0.170 mm; J = 0.032-0.051 mm. Appx49-50 (7:25-8:2) | "moment arm between the upper surface of the fastener element and its preferred bending point near the base of the stem."  App50 (8:9-10). |
| (**C**-**S**) | 0.014 mm. Appx50 (8:31) | Relates to "head overhang distance." Appx50 (8:28-29); Appx51 (9:25) |

| Parameter Relationship | Disclosed Range | Description in the '188 application |
|---|---|---|
| $\dfrac{H-J}{S}$ | 1.0-2.5. Appx51 (9:28) | "Stem Bending Coefficient (SB)" – "the tendency of the fastener element to bend over in response to a lateral force at the head is related both to the moment arm between the upper surface of the fastener element and its preferred bending point near the base of the stem, and the minimum lateral stem dimension at that point." Appx50 (8:7-10). |
| $\dfrac{C-S}{CT}$ | 1.0-5.0. Appx51 (9:28) | "Edge Flex Ratio (EF)" – "flexibility is related to the head overhang distance and its thickness." Appx51 (9:24-27). |
| $\dfrac{\frac{C-S}{CT}}{\frac{H-J}{S}}$ | 0.3-6.0. Appx52 (10:26-27) | "Edge Flex Preference" – "relative flexibility of head edge and stem: the higher the value, the more the edge (with or without toes) will flex before the stem itself bends over to help align the load and prevent release." Appx52 (10:22-18). |
| $\dfrac{H-J}{S} * \dfrac{C-S}{CT}$ | 3.0-10.0. Appx52 (10:19-20) | "Total Flexure Product (TF)" – "The stem will tend to elastically bend over to tilt the head; the rim of the head may flex locally out of its plane to form a local side depression that helps to retain a fiber pulling on the head edge . . . The greater either of the two factors, the greater the overall flexure of the fastener element in response to a lateral load applied locally at the edge of the head." Appx52 (10:10-21). |

The Board cited "*Applied Materials*, 692 F.3d at 1298" for the notion that "a claim to a product does not become nonobvious simply because the patent specification provides a more comprehensive explication of the *known*

48

*relationships* between the variables and the affected properties," Appx14, but the Board ignored the importance of showing that all of the relationships must be *known*.  Namely, the POSITA in the Board's analysis—one equipped with (1) the examiner's annotated Tuma Figure 3; (2) a desire to optimize "attachment/separation force"; and (3) knowledge that overall lateral extent of the head (**C**) and fastener height (**H**) will affect the attachment/separation force (*see* Appx15)—still does not know how to optimize for "softness" or the other taught benefits of the claimed invention.  Appx46-47 (4:29-5:3).  Such a POSITA would be left to guess configurations of dimensions blindly and test the softness of the result of each combination.  It is only via the teachings of the '188 application that a POSITA could use a more educated approach to solve this problem.

Third, Tuma teaches modifying different aspects of the head part besides the dimensions the examiner annotated onto Tuma's Figure 3.  For example, Tuma teaches that the "effective size of the contact surface for the corresponding head part" can be changed with a "connecting section."  Appx351 at [0005].  Tuma describes that "[a]t least one connecting section is designed preferably as a tooth, a serration, and/or a tab."  Appx351 at [0010].  Tuma further describes that "[i]t is expedient for the teeth, the serrations, and/or the tabs to have in each instance a shape in the form of a triangle."  Appx352 at [0010].  Tuma provides various

modified head parts according to the invention in Figures 2a through 2d

(reproduced below).



Appx348 (Fig. 2a-2d).

For the example in Figure 2a, Tuma explains that "[t]he contact surface 22a

is enlarged by the connecting sections 16a, which are designed as teeth 28,

arranged at regular intervals along the outer circular line 26a." Appx352 at [0017].

Tuma also explicitly teaches "enlargement of the contact surface" with similar

features. *Id.* at [0018] and [0020] ("FIG. 2d shows a contact surface 22" having a

size that is enlarged by tabs 32" and comb sections 34 that are connected to the

edge of the triangular contact surface 22".").  None of these teachings describe varying overall lateral extent of the head (**C**) or fastener height (**H**) to achieve any result, as the examiner and the Board asserted.  *See* Appx11.

As a result, a POSITA would have had to conduct significant experiments to optimize the claimed ratios, contrary to the Board's finding that a POSITA would optimize only two of the parameters and arrive at the ranges for each of the claimed ratios.  *See* Appx12.  The disclosure in Tuma is akin to disclosing the entire range of all five dimensions that make up the claimed ratios, which is far too broad to teach each of the claimed ratios and thus is insufficient to show obviousness based on the result-effective variable doctrine.  *See E.I. DuPont*, 904 F.3d at 1006 (providing an exception for "disclosure of very broad ranges [that] may not invite routine optimization").

*Antonie* is again instructive.  The court faulted the Board's analysis there because it required one to read into the prior art material simply not present there. *See Antonie*, 559 F.2d at 620 n.4 ("***Whether one would inevitably arrive at the ratio*** value of 0.12 or above depends on facts which must be read into [the prior art], (e.g., the volume of the tank) and on assumptions about the kind of motivation (e. g., the degree of 'efficiency' which would be sought."); *cf. In re Stepan Co.*, 868 F.3d 1342, 1346 (Fed. Cir. 2017) ("The Board failed to explain why it would have been 'routine optimization' to select and adjust the claimed surfactants and

51

achieve a cloud point above at least 70°C").  Here, the Board's analysis requires a POSITA to speculate about the starting dimensions in Tuma and then hold certain dimensions constant while performing "either (i) a combination of a decrease in overall lateral extent of the head and an increase in fastener height to reduce attachment/separation force or (ii) a combination of an increase in overall lateral extent of the head and a decrease in fastener height to increase attachment/separation force."  Appx12.  The Board *ignored* that a POSITA also would have to hold constant or vary other parameters (i.e., **CT**, **J**, and **S**).  The Board thus failed to explain why a POSITA "would inevitably arrive at the ratio" based on Tuma.  *See Antonie*, 559 F.2d at 620 n.4.

Without a teaching or even direction in Tuma (or elsewhere) as to how to modify Tuma's undisclosed parameters, the Board's conclusion that the claimed ratios would have been obvious is the product of impermissible hindsight.  *See Graham*, 383 U.S. at 36 (discussing the importance of "guard[ing] against slipping into use of hindsight" and "resist[ing] the temptation to read into the prior art the teachings of the invention in issue").  Therefore, as in *Antonie*, the Board's decision should be reversed.

## CONCLUSION

For the foregoing reasons, this Court should reverse the Board's decision affirming the unpatentability of the claims of the '188 application.

Dated:  July 11, 2025                    Respectfully submitted,

                         */s/ Lauren A. Degnan*

Lauren A. Degnan
Joseph R. Dorris
FISH & RICHARDSON P.C.
1000 Maine Avenue, S.W.
Suite 1000
Washington, DC 20024
Telephone:  (202) 783-5070

Kenneth W. Darby, Jr.
FISH & RICHARDSON P.C.
111 Congress Avenue
Suite 2000
Austin, TX 78701
Telephone:  (512) 472-5070

***Attorneys for Appellant***
***VELCRO IP HOLDINGS LLC***

# ADDENDUM

## <u>ADDENDUM INDEX</u>

*In re: Velcro IP Holdings LLC*
No. 25-1607

| Document | Appx Nos. |
|---|---|
| Patent Board Decision - Examiner Affirmed | <u>Appx1-16</u> |
| Rejected Claims on Appeal re App. 17/567,188 | <u>Appx17-20</u> |
| Transmittal of New Application | <u>Appx25-61</u> |

Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇs Pᴀᴛᴇɴᴛ ᴀɴᴅ Tʀᴀᴅᴇᴍᴀʀᴋ Oғғɪᴄᴇ

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 17/567,188 | 01/03/2022 | Luis Parellada Armela | 05918-0697002 | 1032 |

26201          7590          01/24/2025
FISH & RICHARDSON P.C. (AU)
P.O BOX 1022
MINNEAPOLIS, MN 55440-1022

| EXAMINER |
|---|
| SAN, JASON W |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3677 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 01/24/2025 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

PATDOCTC@fr.com

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

*Ex parte* LUIS PARELLADA ARMELA, CHRISTOPHER M. GALLANT,
JAMES L. TARDIFF, and MARK A. CLARNER

_____

Appeal 2024-001534
Application 17/567,188
Technology Center 3600

_____

Before DANIEL S. SONG, MICHELLE R. OSINSKI, and
BRANDON J. WARNER, *Administrative Patent Judges*.

OSINSKI, *Administrative Patent Judge*.

DECISION ON APPEAL

STATEMENT OF THE CASE

Appellant[1] appeals under 35 U.S.C. § 134(a) from the Examiner's
decision rejecting claims 19, 24–33, and 35–39, which are all of the rejected
claims. Final Act. 1. Claims 21–23 and 34 are allowable if rewritten in
independent form including all of the limitations of the base claim and any
intervening claims. *Id.* at 9. A telephonic oral hearing was held on
December 4, 2024. The record includes a transcript of the oral hearing
("Tr."). We have jurisdiction over the appeal under 35 U.S.C. § 6(b).

We AFFIRM.

_____

[1] We use the term "Appellant" to refer to "applicant" as defined in
37 C.F.R. § 1.42. Appellant identifies Velcro IP Holdings LLC. as the real
party in interest. Appeal Br. 1.

Appeal 2024-001534
Application 17/567,188

THE CLAIMED SUBJECT MATTER

Claims 19 and 33 are independent. Claim 19 is reproduced below.

19. A male touch fastener product, comprising
a resin surface;

an array of spaced-apart male touch fastener elements carried on the surface, each touch fastener element extending to an overall height above the resin surface and comprising a stem extending from the surface and having a minimum lateral extent and a bend height defined as the perpendicular distance from the resin surface to a lowermost occurrence of the minimum lateral extent; and

a flat, disc-shaped head disposed at a distal end of the stem, and forming with the stem and the surface a contiguous mass of resin, the head extending laterally from the stem to a distal edge overhanging the surface, the head having an overall lateral extent and having an overhang midpoint thickness measured parallel to the stem from an underside of the head to an upper surface of the head at a position midway between the stem and the distal edge;

wherein for at least most of the fastener elements of the array, the ratio of Edge Flex Ratio to Stem Bending Coefficient is between 0.3 and 6.0, where Stem Bending Coefficient is a ratio of a difference between overall height and bend height to the minimum lateral extent, and Edge Flex Ratio is a ratio of a difference between the overall lateral extent of the head and the minimum lateral extent of the stem to the overhang midpoint thickness.

Appeal Br. 11 (Claims App.).

REFERENCE

The prior art relied upon by the Examiner is:

| Name | Reference | Date |
|---|---|---|
| Tuma | US 2013/0067702 A1 | Mar. 21, 2013 |



2

Appeal 2024-001534
Application 17/567,188

## THE REJECTION

The rejection before us on appeal is:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/ Basis |
|---|---|---|
| 19, 24–33, 35–39 | 103 | Tuma |

## OPINION

Appellant argues independent claims 19 and 33 together as a group, and does not present any separate arguments for dependent claims 24–32 and 35–39. Appeal Br. 3–10; Reply Br. 2–4. We select claim 19 as the representative claim, and claims 24–33 and 35–39 stand or fall therewith. 37 C.F.R. § 41.37(c)(1)(iv).

The Examiner takes the position that Tuma teaches many of the limitations of the male touch fastener product of independent claim 19, including resin surface 12, an array of spaced-apart male touch fastener elements 20a–i carried on resin surface 12, each touch fastener element extending to an overall height above the resin surface and comprising stem 24 extending from surface 12 and having a minimum lateral extent and a bend height defined as the perpendicular distance from resin surface 12 to a lowermost occurrence of the minimum lateral extent; and a flat, disc-shaped head 14a–i disposed at a distal end of stem 24, and forming with stem 24 and surface 12 a contiguous mass of resin, the head 14a–i extending laterally from stem 24 to a distal edge overhanging surface 12, the head 14a–i having an overall lateral extent and having an overhang midpoint thickness measured parallel to stem 24 from an underside of the head 14a–i to an upper surface of the head 14a–i at a position midway between stem 24 and the distal edge. Final Act. 5; Tuma Figs. 1, 3, ¶ 23.



3

Appeal 2024-001534
Application 17/567,188

The Examiner acknowledges, however, that Tuma does not identify what Appellant calls an "Edge Flex Ratio" that is a ratio of a difference between the overall lateral extent of the head and the minimum lateral extent of the stem to the overhang midpoint thickness, nor what Appellant calls a "Stem Bending Coefficient" that is a ratio of a difference between overall height and bend height to the minimum lateral extent. Final Act. 5. The Examiner also acknowledges that, consequently, Tuma does not identify a specific value of a ratio of Edge Flex Ratio to Stem Bending Coefficient that is between 0.3 and 6.0. *Id.*

The Examiner takes the position that Tuma has a "lateral extent, lateral extent of stem, overhang, overall height, bend height," which are all of the dimensions necessary to calculate an Edge Flex Ratio and a Stem Bending Coefficient. Final Act. 6. Thus, the Examiner explains that Tuma has an Edge Flex Ratio and a Stem Bending Coefficient, as well as a ratio of Edge Flex Ratio to Stem Bending Coefficient, even if they are not identified as such. *Id.* at 2–3. The Examiner also takes the position that, although Tuma does not teach a ratio of Edge Flex Ratio to Stem Bending Coefficient being in the claimed range (considering it does not identify a ratio of Edge Flex Ratio to Stem Bending Coefficient), it would have been obvious to have the ratio of Edge Flex Ratio to Stem Bending Coefficient in the claimed range, because "where the general conditions of a claim are disclosed in the prior art, discovering the optimum or workable ranges involves only routine skill in the art." *Id.* at 3 (citing *In re Aller*, <u>220 F.2d 454</u> (CCPA 1955)). The Examiner adds that Appellant "has not disclosed any criticality for the claimed limitations." *Id.* at 3, 5.



4

Appeal 2024-001534
Application 17/567,188

The Examiner notes that the art establishes that the heads and stems of male touch fastener products can be any geometric size and shape. Ans. 6 (citing Kirby et al. (US 2011/0265292 A1; pub. Nov. 3, 2011), ¶ 66). The Examiner takes the position that "[i]t is known in the art to change . . . the value of the dimensions in order to achieve a desired amount of adherence during connection." *Id.* at 5. For example, the Examiner explains that Tuma teaches that "it is known that some portions 'can have a weaker separation force . . . while other portions require a stronger separation force.'" *Id.* (citing Tuma ¶ 2); *see also* Appeal Br. 5 (acknowledging that Tuma "relates to configuring the *contact surface* (the flat distal ends of the projections) to alter the separation force, such as by providing different edge features with tear lines"). The Examiner also explains that "increasing the length alone, would result in a weaker attachment between fastener elements." Ans. 6. Thus, the Examiner reasons that "it would have been obvious to have changed numeric values of the variables in order to adjust attachment/separation force." *Id.*

According to the Examiner, "changing one variable will alter the ratio[,] thereby influencing attachment strength," and "[i]t would have been obvious to one of ordinary skill in the art that changing one value of a measurement affects the other measurements, which change the strength of a connection." Final Act. 6; Ans. 5. The Examiner then explains the position that "the ratio relationships are affected by changes of the variables within the ratio, and therefore, the ratios are result-critical (i.e., changing one variable, fastener height, [a]ffects the attachment strength of the fastener heads)." Final Act. 3–4.



Appeal 2024-001534
Application 17/567,188

The Examiner has explained adequately that one of ordinary skill in the art would have recognized that at least cap surface area (directly related to overall lateral extent of the head) and fastener height would affect attachment/separation force and would have led one of ordinary skill in the art to modify at least cap surface area (directly related to overall lateral extent of the head) and fastener height in order to affect the attachment/separation force.

When increasing cap surface area (thereby necessarily increasing overall lateral extent of the head) and decreasing fastener height, with both of these changes resulting in an *increase* in the force necessary to achieve separation, the ratio of Edge Flex Ratio (which includes overall lateral extent of the head in its numerator) to Stem Bending Coefficient (which includes fastener height in its numerator) will necessarily increase. Conversely, when decreasing cap surface area (thereby necessarily decreasing overall lateral extent of the head) and increasing fastener height, with both of these changes resulting in a *decrease* in the force necessary to achieve separation, the ratio of Edge Flex Ratio (which includes overall lateral extent of the head in its numerator) to Stem Bending Coefficient (which includes fastener height in its numerator) will necessarily decrease.

Accordingly, at least (i) overall lateral extent of the head and (ii) fastener height are known to affect attachment/separation force. Ans. 5–6. Thus, there is evidence that the claimed ratio of Edge Flex Ratio (including overall lateral extent of the head in its numerator) to Stem Bending Coefficient (including fastener height in its numerator) is a result-effective variable—namely, that changes in the variables comprising the ratio of Edge Flex Ratio to Stem Bending Coefficient (thereby resulting in

Appeal 2024-001534
Application 17/567,188

corresponding increases and decreases in the ratio of Edge Flex Ratio to Stem Bending Coefficient) changes the strength of attachment/separation forces—rendering the ratio of Edge Flex Ratio to Stem Bending Coefficient as a variable that can be adjusted by one of ordinary skill in the art to determine a workable or optimal ratio based on a desired application of the fastener. *See In re Applied Materials*, 692 F.3d 1289, 1297 (Fed. Cir. 2012) (supporting that it is well-settled that recognition in the prior art that a property is affected by a variable is sufficient to find the variable result-effective). "In cases in which the disclosure in the prior art was insufficient to find a variable result-effective, there was essentially *no* disclosure of the relationship between the variable and the result in the prior art." *Id.* Here, it is known that changes in the dimensions of overall lateral extent of the head and overall height vary the result of attachment/separation forces, and correspondingly, it is known that changes in a ratio that incorporate these dimensions will also vary the result of attachment/separation forces.

Appellant argues that Tuma does not teach that "weaker and stronger attachment force is affected by variables such as fastener height" and that Tuma instead "relates to configuring the *contact surface* (the flat distal ends of the projections) to alter the separation force, such as by providing different edge features with tear lines." Appeal Br. 5 (citing Tuma ¶ 2); *see also id.* at 6; Reply Br. 2. Although there is no explicit disclosure in Tuma of fastener height affecting attachment force, we agree with the Examiner that one of ordinary skill in the art would implicitly recognize this relationship from the teachings of Tuma. *See* Ans. 6. The prior art must be viewed in the context of what was generally known in the art at the time of the invention. *See Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed.

7

Appeal 2024-001534
Application 17/567,188

Cir. 2013) ("[T]he [*KSR*] Court required an analysis that reads the prior art in context, taking account of 'demands known to the design community,' 'the background knowledge possessed by a person having ordinary skill in the art,' and 'the inferences and creative steps that a person of ordinary skill in the art would employ.'" (quoting *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007))); *In re Taylor Made Golf Co., Inc.*, 589 F. App'x 967 (Fed. Cir. 2014) (the Board erred in failing to consider the prior art in the context of the background knowledge that a person of ordinary skill in the art would have had). It cannot be reasonably disputed that a person of ordinary skill in this art would have known that increasing the height of each individual fastener element would facilitate its deflection and affect attachment force.

Appellant also argues that merely because an individual dimension used in the calculation of a relationship parameter is known to be result-effective, the relationship parameter itself is not necessarily result-effective. Appeal Br. 5. In particular, Appellant argues that "[e]ven were fastener element height shown to be known to be a result-effective variable, that would not itself make either Edge Flex Ratio or Stem Bending Coefficient . . . known to be result-effective." *Id.* at 6. Appellant argues that the Examiner's approach is inconsistent with *In re Antonie* (559 F.2d 618 (CCPA 1977)) because, even though contactor area was known from the cited prior art to be a result-effective variable, the *Antonie* court did not find the claimed ratio involving contactor area (i.e., the ratio of tank volume-to-contactor area) to be result-effective. *Id.* at 6–8. Appellant argues that the Examiner simply has not focused on establishing that the ratio of Edge Flex Ratio to Stem Bending Ratio is result-effective. *Id.* at 8.

8

Appeal 2024-001534
Application 17/567,188

Unlike *In re Antonie*, in which the prior art was silent regarding one of the variables in the ratio, here the Examiner has explained adequately how both variables in the ratio may be modified to increase attachment/separation force if that is desired (thereby necessarily resulting in an increased ratio of Edge Flex Ratio to Stem Bending Coefficient) or may be modified to decrease attachment/separation force if that is desired (thereby necessarily resulting in a decreased ratio of Edge Flex Ratio to Stem Bending Coefficient).

In other words, although *Antonie* found a ratio was not result-effective because the prior art did not disclose a recited ratio, there the prior art did not even recognize that one of the variables in the ratio was relevant to a desired property. *Antonie*, 559 F.2d at 619. In contrast, here, the prior art and the knowledge of one of ordinary skill in the art evidences a recognition that changes in certain dimensions of a male touch fastener appearing in both the numerator and denominator of the claimed ratio will have an effect on the result of the attachment/separation force. Considering that it may be desirable to increase the attachment/separation force or to decrease the attachment/separation force, depending on the desired result for a particular male touch fastener, one of ordinary skill in the art would have been led to either increase or decrease the ratio of Edge Flex Ratio to Stem Bending Coefficient when changing the underlying variables in order to increase or decrease attachment/separation force.

In *In re Antonie*, the claimed device had a ratio of tank volume (the actual volume of liquid in the tanks in which contactors rotate) to contactor area (total area of contactors which is exposed to the wastewater as the contactors are rotated) of a particular value (0.12 gal/sq. ft.). 559 F.2d

9

Appeal 2024-001534
Application 17/567,188

at 619. The Appellant in *Antonie* suggested that "treatment capacity" (the efficiency/effectiveness of a unit of contactor area) is maximized at this particular value. *Id.* The court summarized that "[t]he examiner noted that [the prior art] suggests increasing the 'efficiency' (degree of purification) of his device by increasing the contactor area while apparently keeping the 'throughput' [(the volume of wastewater per unit time (gal./day) which the device must treat)] constant, that is, reducing the 'hydraulic loading.'" *Id.* The court further summarized that "[t]he examiner then assumed that [the prior art] teaches keeping the tank volume constant while increasing the contactor area." *Id.* The court disagreed with the examiner's approach because "[i]t is impossible to recognize, from the experiment taught by [the prior art], that 'treatment capacity' is a function of 'tank volume' or the tank volume-to-contactor area ratio" and "[r]ecognition of this functionality is essential to the obviousness of conducting experiments to determine the value of the 'tank volume' ratio which will maximize treatment capacity." *Id.* at 620.

In contrast, here, the prior art and the knowledge of one of ordinary skill in the art recognize that attachment/separation force is a function of at least both (i) overall lateral extent of the head and (ii) fastener height, which directly relate to the claimed Edge Flex Ratio (including overall lateral extent of the head in its numerator) and the Stem Bending Coefficient (including fastener height in its numerator), respectively. Thus, the prior art and the knowledge of one of ordinary skill in the art suggest conducting experiments to determine the values of the overall lateral extent of the head and fastener height which will result in an optimized and/or desirable attachment/separation force, which will consequently result in a

Appeal 2024-001534
Application 17/567,188

corresponding optimized and/or desirable ratio of Edge Flex Ratio to Stem Bending Coefficient.

Moreover, in *Antonie*, the assumptions of a fixed tank volume and natural motivation to maximize efficiency, as relied on by the examiner, would have led away from the value of the claimed ratio because the prior art already had a tank volume to contactor area ratio less than the claimed value, and increasing the contactor area in an effort to increase efficiency as relied on by the examiner would have made the ratio even smaller. 559 F.2d at 620 n.4. In contrast, here, either (i) a combination of a decrease in overall lateral extent of the head and an increase in fastener height to reduce attachment/separation force or (ii) a combination of an increase in overall lateral extent of the head and a decrease in fastener height to increase attachment/separation force is plausible depending on the desired end result and would necessarily change the ratio of Edge Flex Ratio to Stem Bending Coefficient to be decreased or increased. The Examiner has explained adequately how it would have been obvious to arrive at the claimed range of the ratio of Edge Flex Ratio to Stem Bending Ratio by modifying Tuma so as to arrive at a particular desired attachment/separation force, thereby resulting in a ratio of Edge Flex Ratio to Stem Bending Coefficient that may be higher or lower than that of Tuma's.

Appellant maintains that the cited prior art does not show that any of its specific claimed parameters "have been recognized as being of any relevance to any ascertainable result." Reply Br. 3–4 (emphasis omitted). As described above in more detail, the Examiner's rejection is based on the obviousness of changing specific dimensions (e.g., overall lateral extent of the head and fastener height) to arrive at a desired attachment/separation

Appeal 2024-001534
Application 17/567,188

force, which will necessarily result in changing the claimed ratio of Edge
Flex Ratio to Stem Bending Coefficient to be greater or smaller.

Appellant next argues that it is "under no burden to show criticality
for these parameter ranges." Appeal Br. 9 (emphasis omitted). Although
that is correct where the rejection based on optimization of a recognized
result effective variable is erroneous, we are not persuaded that the
Examiner's rejection is in error here. Thus, it would be incumbent upon
Appellant to rebut the prima facie case of obviousness by showing through
persuasive evidence the criticality of the claimed ratio range and that it
"'produce[s] a new and unexpected result which is different in kind and not
merely in degree from the results of the prior art.'" *Applied Materials*, 692
F.3d at 1297 (quoting *In re Aller*, 220 F.2d at 456).

We have also considered Appellant's argument that "[t]here is
insufficient information in Tuma . . . to determine most of the dimensions
that would be required to calculate the constituent parts of the claimed
parameters, even in one example." Appeal Br. 10. We note that this not a
case where the Examiner is suggesting that there is a specific example in
Tuma in which the ratio of Edge Flex Ratio to Stem Bending Coefficient is
inherent or necessarily follows from explicit teachings in Tuma. Rather, the
Examiner's rejection is based on the obviousness of modifying Tuma's
device (*see* Tuma Fig. 3) to increase or decrease attachment/separation
forces, thereby arriving at the claimed ratio of Edge Flex Ratio to Stem
Bending Coefficient.

Moreover, the predecessor of our reviewing court has instructed that
"we did not mean that things patent drawings show clearly are to be
disregarded." *In re Mraz*, 455 F.2d 1069, 1072 (CCPA 1972). The

12

Appeal 2024-001534
Application 17/567,188

drawings in this case can show the relative proportion of different specific
dimensions of elements to each other (e.g., overall height, bend height, stem
diameter, cap diameter, cap thickness), regardless of the specific values,
which is sufficient when considering a claimed ratio that is a dimensionless
number.  *See* Tr. 4:23–5:1 (describing both Edge Flex Ratio and Stem
Bending Coefficient as dimensionless parameters).

  Appellant's Specification explains that in some instances, "the relative
flexibility of rim edge and stem is important."  Spec. 10:22.  Appellant
expresses the "ratio of Edge Flex Ratio and Stem Bending Coefficient" as
"relat[ing] to the relative flexibility of head edge and stem."  *Id.* at 10:24.
Consequently, "the higher the value [of the ratio]," a user will understand
"the more the edge (with or without toes) will flex before the stem itself
bends over to help align the load and prevent release."  *Id.* at 10:24–26; *see
also* Tr. 5:13–16.  Thus, the claimed ratio of independent claim 19 appears
to be directed toward identifying particular values that may represent a
desirable combination of expected properties relating to male touch
fasteners' flexibility, as opposed to recognizing that a particular value for the
ratio achieves some type of unexpected results.

  Although the Specification may provide some details regarding
relationships between the various dimensions and their effect on the
flexibility and attachment/separation force of the male touch fasteners, "a
claim to a product does not become nonobvious simply because the patent
specification provides a more comprehensive explication of the known
relationships between the variables and the affected properties."  *Applied
Materials*, 692 F.3d at 1298.  Although the prior art is not necessarily
concerned with understanding whether a cap edge will flex before a stem

Appeal 2024-001534
Application 17/567,188

(Spec. 10:22–26), the Examiner has explained adequately how the prior art is concerned with (i) dimensions that will affect the attachment/separation force and (ii) the desirability for variability of attachment/separation force, which necessarily results in changes in the ratio of Edge Flex Ratio to Stem Bending Coefficient to be either higher (in cases where a decreased attachment/separation force is desired) or lower (in cases where an increased attachment/separation force is desired).  Thus, the prior art and knowledge of one of ordinary skill in the art support that the claimed ratio (although not identified/named as such) affects a result of attachment/separation forces (i.e., is a result-effective variable) and that it is desirable to change the claimed ratio so as to affect a result (i.e., both to make the ratio higher and to make the ratio lower) to increase or decrease separation/attachment forces.

For the foregoing reasons, Appellant has not apprised us of error in the Examiner's determination that the subject matter of independent claim 19 is rendered obvious by Tuma.  Accordingly, we sustain the rejection of claim 19, and claims 24–33 and 35–39 falling therewith, for which Appellant relies on the same arguments and reasoning (Appeal Br. 3–10), under 35 U.S.C. § 103 as unpatentable over Tuma.

CONCLUSION

The Examiner's rejection is affirmed.



Appeal 2024-001534
Application 17/567,188

## DECISION SUMMARY

In summary:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/Basis | Affirmed | Reversed |
|---|---|---|---|---|
| 19, 24–33, 35–39 | 103 | Tuma | 19, 24–33, 35–39 | |

## TIME PERIOD FOR RESPONSE

No time period for taking any subsequent action in connection with this appeal may be extended under 37 C.F.R. § 1.136(a). *See* 37 C.F.R. § 1.136(a)(1)(iv).

## <u>AFFIRMED</u>



15

## REJECTED CLAIMS ON APPEAL (U.S. APP. NO. 17/567,188)

1-18. (Canceled)

19.  (Original) A male touch fastener product, comprising

a resin surface;

an array of spaced-apart male touch fastener elements carried on the surface, each touch fastener element extending to an overall height above the resin surface and comprising

a stem extending from the surface and having a minimum lateral extent and a bend height defined as the perpendicular distance from the resin surface to a lowermost occurrence of the minimum lateral extent; and

a flat, disc-shaped head disposed at a distal end of the stem, and forming with the stem and the surface a contiguous mass of resin, the head extending laterally from the stem to a distal edge overhanging the surface, the head having an overall lateral extent and having an overhang midpoint thickness measured parallel to the stem from an underside of the head to an upper surface of the head at a position midway between the stem and the distal edge;

wherein for at least most of the fastener elements of the array, the ratio of Edge Flex Ratio to Stem Bending Coefficient is between 0.3 and 6.0, where Stem Bending Coefficient is a ratio of a difference between overall height and bend height to the minimum lateral extent, and Edge Flex Ratio is a ratio of a difference between the overall lateral extent of the head and the minimum lateral extent of the stem to the overhang midpoint thickness.

20.  (Canceled).

21.  (New)    The male touch fastener product of claim 19, wherein the distal edge comprises multiple toes extending laterally outward and varying in shape and size about the edge, with adjacent toes having facing, free-form resin surfaces defining crevices therebetween, the crevices being narrower than the adjacent toes.

22.  (New)    The male touch fastener product of claim 21, wherein the edge has between 5 and 50 toes.

23. (New)    The male touch fastener product of claim 21, wherein at least one of the crevices is defined between toe surfaces that are generally parallel over at least 30 percent of an overall length of the crevice.

24. (New)    The male touch fastener product of claim 19, wherein the stem has a molded peripheral surface.

25. (New)    The male touch fastener product of claim 24, wherein the head has a molded underside surface.

26. (New)    The male touch fastener product of claim 19, wherein the fastener elements extend to an overall height from the resin surface of between about 0.08 and 0.3 millimeter.

27. (New)    The male touch fastener product of claim 19, wherein the head has an upper surface defining a central depression.

28. (New)    The male touch fastener product of claim 19, wherein the head has an underside surface that defines a curve extending from a narrowest portion of the stem to the rim of the head.

29. (New)    The male touch fastener product of claim 19, wherein the array comprises staggered rows of fastener elements.

30. (New)    The male touch fastener product of claim 29, wherein each head is essentially equally spaced from each of six other heads.

31. (New)    The male touch fastener product of claim 19, wherein the array comprises at least one row of the male touch fastener elements arranged such that heads of adjacent fastener elements of the row are spaced from each other a distance that is between 1.2 and 2.0 times a minimum lateral dimension of the stems of the adjacent fastener elements.

32. (New)    The male touch fastener product of claim 19, wherein the ratio of Edge Flex Ratio to Stem Bending Coefficient is between 0.5 and 5.

33. (New)      A male touch fastener product, comprising a resin surface;

an array of spaced-apart male touch fastener elements carried on the surface, each touch fastener element extending to an overall height above the resin surface and comprising

a stem extending from the surface and having a minimum lateral extent and a bend height defined as the perpendicular distance from the resin surface to a lowermost occurrence of the minimum lateral extent; and

a head disposed at a distal end of the stem, and forming with the stem and the surface a contiguous mass of resin, the head extending laterally from the stem to a distal edge overhanging the surface, the head having an overall lateral extent and having an overhang midpoint thickness measured parallel to the stem from an underside of the head to an upper surface of the head at a position midway between the stem and the distal edge;

wherein for at least most of the fastener elements of the array, the product of Stem Bending Coefficient and Edge Flex Ratio is between 3.0 and 10.0, where Stem Bending Coefficient is a ratio of a difference between overall height and bend height to the minimum lateral extent, and Edge Flex Ratio is a ratio of a difference between the overall lateral extent of the head and the minimum lateral extent of the stem to the overhang midpoint thickness.

34. (New)      The male touch fastener product of claim 33, wherein the distal edge comprises multiple toes extending laterally outward and varying in shape and size about the edge, with adjacent toes having facing, free-form resin surfaces defining crevices therebetween, the crevices being narrower than the adjacent toes.

35. (New)      The male touch fastener product of claim 33, wherein the stem has a molded peripheral surface.

36. (New)      The male touch fastener product of claim 33, wherein the fastener elements extend to an overall height from the resin surface of between about 0.08 and 0.3 millimeter.

37. (New)      The male touch fastener product of claim 33, wherein the head has an upper surface defining a central depression.

38. (New)    The male touch fastener product of claim 33, wherein the array comprises staggered rows of fastener elements.

39. (New)    The male touch fastener product of claim 33, wherein the array comprises at least one row of the male touch fastener elements arranged such that heads of adjacent fastener elements of the row are spaced from each other a distance that is between 1.2 and 2.0 times a minimum lateral dimension of the stems of the adjacent fastener elements.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

**In re Velcro IP Holdings**                    )
**Serial No. 17/567,188**                       )                    Appeal No: 25-1607

## NOTICE FORWARDING CERTIFIED LIST

A notice of appeal to the United States Court of Appeals for the Federal Circuit was timely filed on March 27, 2025, in the Patent and Trademark Office in connection with the above-identified patent application.  Pursuant to 35 U.S.C. § 143 and Federal Circuit Rule 17(b)(1), a certified list is this day being forwarded to the Federal Circuit.

Michael S. Forman is the attorney representing the Director in this appeal. Counsel for Appellant must contact the Solicitor's Office at 571-272-9035 to arrange for designating the record.

Respectfully submitted,

Under Secretary of Commerce for
Intellectual Property and Director of the
United States Patent and Trademark Office

Date:  May 12, 2025                     By:   _/s/Natasha M. Brotten_____
                                        Natasha M. Brotten
                                        Paralegal Specialist
                                        Mail Stop 8
                                        P.O. Box 1450
                                        Alexandria, VA 22313-1450
                                        571-272-9035



## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing NOTICE FORWARDING CERTIFIED LIST has been served, via Electronic Mail, on Counsel for Appellant this 12th day of May 2025 as follows:

Lauren A. Degnan
degnan@fr.com

Kenneth W. Darby, Jr.
kdarby@fr.com

Joseph R. Dorris
dorris@fr.com

By: _/s/Natasha M. Brotten__
**Natasha M. Brotten**
Paralegal Specialist

Form PTO 55 (12-80)

# U.S. DEPARTMENT OF COMMERCE
## United States Patent and Trademark Office

**   May 12, 2025   **
(Date)

**THIS IS TO CERTIFY** that the annexed is a list of the contents comprised of the electronic file of the Patent Application identified below, said contents list being a list of the papers comprising the record before the United States Patent and Trademark Office for the Patent Application of:

*Applicant(s):* **Luis Parellada Armela; Christopher M. Gallant; James L. Tardiff; Mark A. Clarner**

*Date Filed:* **01/03/2022**

*Serial No:* **17/567,188**

*Title:* ***Male Touch Fastener Elements***

By authority of the

**UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE**

/s/ Natasha M. Brotten

*Certifying Officer*





## Prosecution History 17/567,188

| Date | Document |
|------|----------|
| 01/03/2022 | Transmittal of New Application |
| 01/03/2022 | Fee Worksheet |
| 01/03/2022 | Application Data Sheet |
| 01/03/2022 | Preliminary Amendment |
| 01/03/2022 | Declaration for Utility or Design Application Using An Application Data Sheet |
| 01/03/2022 | Power of Attorney |
| 01/14/2022 | Filing Receipt |
| 01/14/2022 | Fee Worksheet |
| 04/21/2022 | Notice of Publication |
| 08/05/2022 | Information Disclosure Statement |
| 10/26/2022 | Non-Final Office Action |
| 01/24/2023 | Request for Reconsideration-After Non-Final Office Action |
| 03/20/2023 | Final Office Action |
| 05/11/2023 | Response After Final Office Action |
| 05/24/2023 | Advisory Action |
| 05/24/2023 | Notice of Appeal from the Examiner to the Patent Trial and Appeal Board |
| 05/24/2023 | Fee Worksheet |
| 07/07/2023 | Appeal Brief |
| 07/17/2023 | Notice - Defective Appeal Brief |
| 08/14/2023 | Supplemental Appeal Brief |
| 08/18/2023 | Notice - Defective Appeal Brief |
| 10/18/2023 | Appeal Brief |
| 10/18/2023 | Fee Worksheet |
| 12/11/2023 | Examiner's Answer |
| 02/12/2024 | Reply Brief |
| 02/12/2024 | Electronic Fee Payment |
| 02/12/2024 | Request for Oral Hearing |
| 02/15/2024 | Patent Trial and Appeal Board Docketing Notice |
| 09/30/2024 | Notification of Appeal Hearing |
| 10/04/2024 | Confirmation of Hearing by Appellant |
| 10/23/2024 | Decision Granting Telephonic Hearing |
| 01/03/2025 | Patent Trial and Appeal Board Oral Hearing Transcript |
| 01/24/2025 | Decision on Appeal |





Street Address
Fish & Richardson P.C.
One Congress Plaza
Suite 810
111 Congress Avenue
Austin, TX 78701

Mail Address
P.O. Box 1022
Minneapolis, MN 55440-1022

512 472 5070 main
512 320 8935 fax

January 3, 2022

Attorney Docket No.:   05918-0697002  / VGCP No. 11480

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

<u>Presented for filing is a new continuation patent application of:</u>

Inventor(s): LUIS PARELLADA ARMELA, CHRISTOPHER M. GALLANT, JAMES L.
            TARDIFF AND MARK A. CLARNER

Title:       MALE TOUCH FASTENER ELEMENTS


Enclosed are the following papers, including those required to receive a filing date under 37
CFR 1.53(b):

|                | Pages |
|----------------|-------|
| Specification  | 14    |
| Claims         | 4     |
| Abstract       | 1     |
| Declaration    | 4     |
| Drawing(s)     | 10    |

Enclosures:

— Application Data Sheet, 9 pages.
— Preliminary amendment, 6 pages.
— Power of Attorney, 1 page.


| | | | |
|---|---|---|---|
| Basic Filing Fee | | | $320 |
| Search Fee | | | $700 |
| Examination Fee | | | $800 |
| Total Claims 20 | over 20 | **0 x $100** | $0 |
| Independent Claims 2 | over 3 | **0 x $480** | $0 |
| Fee for Multiple Dependent claims | | | $0 |
| Application size fee for each 50 pages over 100 | | | |
| Total Sheets: 29 x .75 - 100/50 = 0x | | | $0 |



fr.com



Commissioner for Patents
January 3, 2022
Page 2

Total Filing fee                                        $1820

Please apply any necessary charges or credits to Deposit Account 06-1050, referencing the attorney docket number shown above.

I hereby authorize the USPTO to communicate in response to email communications from the undersigned and practitioners under Customer No. 26201 in accordance with 37 CFR 1.33 and 37 CFR 1.34 concerning any subject matter of this application via email. I understand that a copy of these communications will be made of record in the application file. (MPEP 502.03).

If this application is considered to be incomplete, or if a telephone conference would otherwise be helpful, call the undersigned at 512-472-5070.

Send all correspondence to:

26201
Customer Number

Respectfully submitted,

/James W. Babineau/

James W. Babineau
Registration No. 42,276

Enclosures

JWB/sco
24179950.doc





**FIG. 1**

Docket No. 059-0709U2
Applicant: Velcro IP Holdings LLC
2 of 10



**FIG. 2**



**FIG. 3**



FIG. 4

FIG. 5



**FIG. 7**



**FIG. 6**



FIG. 8

FIG. 9



**FIG. 10**



**FIG. 11**



**FIG. 12**

**FIG. 13**



**FIG. 14**

**FIG. 15**



**FIG. 16**

Attorney Docket No. 05913-0378P02
Applicant: Velcro IP Holdings LLC
10 of 10



**FIG. 17**

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | |
| **Filing Date:** | |
| **Title of Invention:** | MALE TOUCH FASTENER ELEMENTS |
| **First Named Inventor/Applicant Name:** | Luis Parellada Armela |
| **Filer:** | James Babineau/Suzanne O'Neill |
| **Attorney Docket Number:** | 05918-0697002 VGCP 11480 |

Filed as Large Entity

Filing Fees for **Utility under 35 USC 111(a)**

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| UTILITY APPLICATION FILING | 1011 | 1 | 320 | 320 |
| UTILITY SEARCH FEE | 1111 | 1 | 700 | 700 |
| UTILITY EXAMINATION FEE | 1311 | 1 | 800 | 800 |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |
| **Miscellaneous:** | | | | |
| | | | **Total in USD ($)** | **1820** |

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 44650266 |
| **Application Number:** | 17567188 |
| **International Application Number:** | |
| **Confirmation Number:** | 1032 |
| **Title of Invention:** | MALE TOUCH FASTENER ELEMENTS |
| **First Named Inventor/Applicant Name:** | Luis  Parellada Armela |
| **Customer Number:** | 26201 |
| **Filer:** | James Babineau/Suzanne O'Neill |
| **Filer Authorized By:** | James Babineau |
| **Attorney Docket Number:** | 05918-0697002 VGCP 11480 |
| **Receipt Date:** | 03-JAN-2022 |
| **Filing Date:** | |
| **Time Stamp:** | 08:25:22 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | DA |
| Payment was successfully received in RAM | $1820 |
| RAM confirmation Number | E202213925533056 |
| Deposit Account | |
| Authorized Us | |

The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows:

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | | 05918-0697002Application.pdf | 135959 <br><br> b8c34c928313d331b7b6dd3c4f3186262ca46f31 | yes | 19 |

| Multipart Description/PDF files in .zip description | | |
|---|---|---|
| Document Description | Start | End |
| Specification | 1 | 14 |
| Claims | 15 | 18 |
| Abstract | 19 | 19 |

**Warnings:**

**Information:**

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 2 | Application Data Sheet | 05918-0697002ADS.pdf | 1823259 <br><br> d815dfa994fd307a93c71d0aca21be0f708d2120 | no | 9 |

**Warnings:**

**Information:**

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 3 | | 05918-0697002PreliminaryAmendment.pdf | 77108 <br><br> f7d5c8b0675888e1be01cc05e76e6ec1efc2dd10 | yes | 6 |

| Multipart Description/PDF files in .zip description | | |
|---|---|---|
| Document Description | Start | End |
| Preliminary Amendment | 1 | 1 |
| Claims | 2 | 5 |
| Applicant Arguments/Remarks Made in an Amendment | 6 | 6 |

**Warnings:**

**Information:**

| 4 | Oath or Declaration filed | 05918-0697002SignedDeclaration.pdf | 1925167<br><br>211fb7cf6b5291e705351068babb5d822948<br>57f58 | no | 4 |
|---|---|---|---|---|---|

| **Warnings:** | | | | | |
|---|---|---|---|---|---|
| **Information:** | | | | | |

| 5 | Power of Attorney | 05918_Signed_POA.pdf | 668764<br><br>2fad22e97fca39cd22c76c1fc35c38baae2a3<br>a89 | no | 1 |
|---|---|---|---|---|---|

| **Warnings:** | | | | | |
|---|---|---|---|---|---|
| **Information:** | | | | | |

| 6 | Transmittal of New Application | 05918-0697002Transmittal.pdf | 95594<br><br>25af6111dcc527e99720715eac6aa05eb62<br>8aae6 | no | 2 |
|---|---|---|---|---|---|

| **Warnings:** | | | | | |
|---|---|---|---|---|---|
| **Information:** | | | | | |

| 7 | Drawings-only black and white line drawings | 05918-0697002Drawings.pdf | 1482624<br><br>254a3b5f1242ce4163b5eed6cb8a64e81a8<br>400a3 | no | 10 |
|---|---|---|---|---|---|

| **Warnings:** | | | | | |
|---|---|---|---|---|---|
| **Information:** | | | | | |

| 8 | Fee Worksheet (SB06) | fee-info.pdf | 44225<br><br>996cfde955ebb3314b13f7ab89c065a5d38<br>1bfee | no | 2 |
|---|---|---|---|---|---|

| **Warnings:** | | | | | |
|---|---|---|---|---|---|
| **Information:** | | | | | |
| | **Total Files Size (in bytes):** | | 6252700 | | |



This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.
**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.
**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.



Atty Docket No.: 05918-0697002

## MALE TOUCH FASTENER ELEMENTS

### CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. Serial No. 16/699,790, filed December 2, 2019, which claims priority to U.S. Provisional Serial No. 62/774,459, filed December 3, 2018, and each application is hereby incorporated by reference in its entirety.

### TECHNICAL FIELD

This invention relates to touch fastener elements, and more particularly to molded touch fastener elements of the mushroom type.

### BACKGROUND

Touch fasteners are useful for releasable engagement of surfaces in products ranging from diapers to construction materials. In most cases, the engagement is between an array of very small male fastener elements and a field of fibers or loops, but in some cases heads of the male fastener elements can be shaped and spaced so as to releasably engage a similar array. Some male fastener elements have heads that overhang along only one lateral direction, while others overhang in multiple directions (or in all directions). The former (often referred to as J-shaped or palm tree fasteners) tend to have very directional engagement characteristics, whereas the latter (often referred to as mushroom-shaped fasteners) have engagement characteristics that are more uniform in all directions. Each type of male fastener element has its preferred uses in commercial products. Mushroom-shaped fastener elements can be made with fairly thin heads, for engagement with very low loft fibers as tend to be found in inexpensive non-woven materials. Improvements in fastener element shape, and in methods of making such shapes, are continually sought.

### SUMMARY

Various aspects of the invention feature a male touch fastener product with a resin surface and an array of spaced-apart male touch fastener elements carried on the surface. Each touch fastener element has a stem extending from the surface, and a head disposed at a



- 1 -

distal end of the stem, the head forming with the stem and the surface a contiguous mass of resin. The head extends from the stem to a distal edge overhanging the surface.

According to one aspect of the invention, the distal edge has multiple toes extending laterally outward and varying in shape and size about the edge, with adjacent toes having facing, free-form resin surfaces defining crevices between them, the crevices being narrower than the adjacent toes. In some examples, the distal edge has between 5 and 50 toes, and in some cases, between 10 and 30 toes. Preferably, there are between 30 and 100 toes per millimeter of head perimeter. In some embodiments, at least one of the crevices is defined between toe surfaces that are generally parallel over at least 30 percent of an overall length of the crevice.

Another aspect of the invention features a touch fastening having a fibrous surface having exposed fibers, and the male touch fastener product as recited above releasably engaged with the fibrous surface, with fibers of the fibrous surface snagged in crevices between toes of the heads.

According to another aspect of the invention, the array has at least one row of the male touch fastener elements arranged such that heads of adjacent fastener elements of the row are spaced from each other a distance that is between 1.2 and 2.0 times (preferably between 1.4 and 1.8 times) a minimum lateral dimension of the stems of the adjacent fastener elements. Preferably, for at least most of the fastener elements of the array the ratio of a difference between the overall lateral extent of the head and a minimum lateral extent of the stem to the overhang midpoint thickness is between 1.0 and 5.0 (preferably between 1.4 and 2.0).

According to another aspect of the invention, the stem has a minimum lateral extent and a bend height defined as the perpendicular distance from the resin surface to a lowermost occurrence of the minimum lateral extent. For at least most of the fastener elements of the array, the product of Stem Bending Coefficient and Edge Flex Ratio (as those terms are defined below) is between 3.0 and 10.0, where Stem Bending Coefficient is a ratio of a difference between overall height and bend height to the minimum lateral extent of the stem, and Edge Flex Ratio is a ratio of a difference between the overall lateral extent of the head and the minimum lateral extent of the stem to the overhang midpoint thickness.



- 2 -

According to another aspect of the invention, for at least most of the fastener elements of the array, the ratio of Edge Flex Ratio to Stem Bending Coefficient is between 0.3 and 6.0 (preferably between 0.5 and 5).

According to yet another aspect of the invention, at least three adjacent fastener elements each has a Stem Bending Coefficient of between 1.4 and 2.0.

In any of these aspects, the product preferably exhibits a Toccare micro-texture coarseness, as measured on the array, of between 20 and 30, and/or a Toccare micro-texture roughness, as measured on the array, of between 25 and 40.

According to another aspect of the invention, the product exhibits a Toccare micro-texture coarseness, as measured on the array, of between 20 and 30.

According to yet another aspect of the invention, the product exhibits a Toccare micro-texture roughness, as measured on the array, of between 25 and 40.

Embodiments according to any of the above aspects may be provided with any combination of the following features.

In some cases, the stem has a molded peripheral surface.  In some examples, the head has a molded underside surface.

In some embodiments, the stem is of round cross-section and/or extends perpendicular to the resin surface.

In some examples, the head is disc-shaped.

The array preferably has a density of between 1300 and 5500 fastener elements per square centimeter, and the fastener elements preferably each extend to an overall height from the resin surface of between about 0.08 and 0.3 millimeter.

In some cases, the head has an essentially flat upper surface.  In some examples, the head has an upper surface defining a central depression.

The head may have a nominal thickness, for example, of between 0.01 and 0.04 millimeter.

In some embodiments, the head has an underside surface that defines a curve extending from a narrowest portion of the stem to the rim of the head.  For example, the curve may follows an arc with a radius greater than half a lateral extent of a lateral cross-section of the narrowest portion of the stem.



- 3 -

In some configurations, the array has staggered rows of fastener elements.  For example, each head may be essentially equally spaced from each of six other heads.

In some cases, the array defines a regular row spacing.

The resin surface may be of a resin base having a thickness less than about 0.1 millimeter, for example.  In some cases, the resin base is laminated to a web, and may be surrounded by exposed web surface to form an island of resin.  In some examples, the web comprises fabric.

Another aspect of the invention features a method of forming a male touch fastener product.  The method includes molding a resin surface while forming an array of spaced-apart male touch fastener elements extending from the surface, by pressing moldable resin into respective molding cavities defined in a mold against which mold the resin surface is molded, solidifying the pressed resin in the molding cavities, and then stripping the solidified resin from the cavities as stems with associated heads disposed at distal ends of the stems and overhanging the surface.  As stripped from the cavities the heads have distal edges with multiple toes extending laterally outward and varying in shape and size about the edge, with adjacent toes having facing, free-form resin surfaces defining crevices between them, each crevice narrower than the adjacent toes.

In some embodiments, an innermost portion of each cavity is bounded by a smooth rim surface.  In some cases, each cavity is defined by a surface against which an underside of the head is formed and defines a curve extending from a point forming a narrowest portion of the stem to the rim surface.  Preferably the curve follows an arc with a radius greater than half a lateral extent of a lateral cross-section of the cavity at the point forming the narrowest portion of the stem.

In some examples the mold features a rotatable mold roll, and the method is performed continually during rotation of the mold roll to produce an elongated flexible fastener product.

In some cases the method also includes, after forming the array of spaced-apart male touch fastener elements, plastically stretching the resin surface.

The fastener elements described herein can be formed at very high speeds in the production of inexpensive fastener products.  Moreover, due in part to their size, arrangement and specific design features, arrays of such fastener elements can be made to exhibit

- 4 -

Atty Docket No.: 05918-0697002

particularly advantageous levels of softness to the human touch.  In some cases such arrays can be formed on resin sheets such that it can be difficult for a layperson to tell which side of the sheet is the fastening surface, without engaging the surface with fibers.

The details of one or more embodiments of the invention are set forth in the accompanying drawings and the description below. Other features, objects, and advantages of the invention will be apparent from the description and drawings, and from the claims.

## DESCRIPTION OF DRAWINGS

Fig. 1 is an enlarged, partial perspective view of a touch fastener being separated.

Fig. 2 is a perspective view of an array of mushroom-type male fastener elements extending from a common resin base.

Fig. 3 is a side view of the array of Fig. 2.

Fig. 4 is a top view of the array of Fig. 2.

Fig. 5 is a highly magnified, top perspective view of one fastener element.

Fig. 6 is a top view of one fastener element and a portion of an adjacent fastener element.

Fig. 7 is a side view of a single fastener element.

Fig. 8 is a magnified view of a field of microfibers.

Fig. 9 shows fine fibers engaged with an array of fastener elements.

Fig. 10 is an enlarged view of a single engaged fastener element near the center of Fig. 9.

Fig. 11 is an enlarged view of an area near the bottom right corner of Fig. 9.

Fig. 12 shows fibers caught between toes of a fastener element head rim.

Fig. 13 shows fiber loads bending individual toes out of the plane of the head rim.

Fig. 14 schematically illustrates a method and apparatus for forming an array of fastener elements with a continuous base sheet.

Fig. 15 shows a cross-section of an individual cavity in which a fastener element or fastener element preform is molded.

Fig. 16 illustrates the process of counting toes about a head perimeter.

Fig. 17 is a top view of a non-circular touch fastener element with toes.

Like reference symbols in the various drawings indicate like elements.

- 5 -

## DETAILED DESCRIPTION

Referring first to Fig. 1, fastener product 10 has a base sheet 12 of resin and an array of male touch fastener elements 14 extending from a broad resin side surface 16 of the base sheet.  To give some proportion, base sheet 12 is about 60 μm hick and can be up to one meter or more in width, and can be manufactured in continuous length and rolled for transport.  The fastener elements are arranged in an array on the base sheet surface, with a density of about 2700 per square centimeter, each fastener element extending only about 0.125 mm from the base sheet surface.  The fastener elements, which are not shown to scale, are illustrated as having snagged very fine fibers 16 of a mating sheet 18 of material, such that as the two mated materials are peeled away from one another, the snagged fibers are stretched taut prior to being released.  In this manner the two materials together form a releasable fastening.  The fibers the fastener elements are designed to snag and retain are extremely fine, as will be discussed in more detail below, making fastener product 10 particularly useful in snagging very low-loft knit materials, such as those formed of cotton or silk.

Referring next to Figs. 2 and 3, the fastener elements 14 are formed with discrete circular stems 20 of resin rising integrally from a near surface of base sheet 12.  The diameter of each stem 20 may be about the same as the thickness of the base sheet in some cases.  The base of each stem blends into the base sheet with a generous radius approximately equal to half of the nominal stem diameter.  Above the base radius the stem rises with essentially a constant diameter to a head or cap 22 that extends radially or laterally outward from the stem to overhang the base sheet surface and has an overall diameter about twice the diameter of the stem.  As can be seen in Fig. 3, the diameter of each stem 20 is significantly greater than the thickness of the head on the stem.  The underside of the head is generally frustoconical or radiused from the stem to the distal edge of the head.

As shown in Fig. 4, the fastener elements 14 are arranged in a regular array of staggered rows and columns, with the heads 22 of adjacent fastener elements spaced apart to allow fibers to enter the volume between the base sheet and the undersides of the heads so as to be snagged.  Arrow MD in Fig. 4 indicates the machine direction of the process that manufactured the photographed product.  The column spacing CS and the row spacing RS between fastener elements of a given column are both about twice the nominal head

- 6 -

Atty Docket No.: 05918-0697002

diameter, or in this example about 205 μm.   The upper surfaces of the heads are generally flat and parallel to the base sheet, and have a generally circular perimeter.  However, when highly magnified as in Fig. 5 it is apparent that the heads 22 do not have exactly circular perimeters. Rather, the head edge has a series of projections extending radially or laterally

5    outward about its perimeter.  Given their size and shape, we have come to refer to these projections as toes 24.  As evident from the photograph, the width and shape of the toes vary about the perimeter of the head, as does the width and length of the gaps separating adjacent toes.  As will be discussed in more detail below, the number, size and shape of toes about the head perimeter do not correspond with any features of the cavity in which the head rim was

10    molded.  Rather, the facing sides of adjacent toes are generally curved and have been free-formed rather than formed against a mold surface.  Some wider toes each appear to have multiple edge projections, while some appear to neck in width at their base.  Moreover, the arrangement of toes is not precisely duplicated across each fastener element, although there are similarities in the overall distribution of toe size across fastener elements of the product.

15    Referring next to Fig. 6, the fastener element head 22 can be said to have a nominal cap diameter 'C' of about 0.077 mm.  In various runs of the product, the average cap diameter 'C' was found to range from 0.077 to 0.123 mm.  'C' is measured between the tips of toes on opposite sides of the head and represents the overall diameter of the fastener element head.  The separation distance CCS between adjacent heads 22 of the array is about

20    0.092 mm.  In various runs of the product, the average spacing CCS was found to range from 0.078 to 0.111 mm.

As shown in the schematic representation of a fastener element 14 in Fig. 7, the fastener element has an overall height 'H' as measured perpendicular to the base sheet 12 to the upper surface of head 22.  In this example 'H' was measured to be 0.126 mm, but in

25    various runs of the product the average height was found to range from 0.126 to 0.170 mm. The stem 20 has a circular cross-section and extends perpendicularly from the base sheet 12. The stem has a nominal diameter 'S' over a length of the stem including its midpoint height, blending into a radius at the base of the stem at a distance 'J' from the base sheet, and blending into a flaring of the underside of the head at the top of the stem.  In this example 'S'

30    was measured to be 0.049 mm, but in various runs of the product the average stem diameter was found to range from 0.049 to 0.066 mm.  In this example 'J' was measured to be 0.043

mm, but in various runs of the product the average value for 'J' was found to range from 0.032 to 0.051 mm. Distance 'J' is related to the flexibility of the fastener element in response to a lateral load applied at the head, as the stem will tend to bend at or near the lowest extent of the straight shank of the stem.

5     We have observed how readily the above-described flat-topped mushroom fastener elements can bend in response to lateral loads applied to the head, such as by a finger applying light pressure as it moves across the field. For a given resin, the tendency of the fastener element to bend over in response to a lateral force at the head is related both to the moment arm between the upper surface of the fastener element and its preferred bending

10     point near the base of the stem, and the minimum lateral stem dimension at that point. For ease of analysis, we have defined the Stem Bending Coefficient (SB) as the ratio of H-J to S. Preferably this ratio is between 1.0 and 2.5, more preferably between 1.4 and 2.0. For round stems 'S' is the diameter; for other shapes 'S' should be taken as the minimum lateral dimension. Resins and designs that enable a fastener element so bent over to recover over

15     time to at least close to its original vertical orientation upon removal of the force are preferred. Ideally the upper surface of the fastener element is essentially flat, as opposed to hemispherical, for example.

    Referring also back to Fig. 6, the ability of the field to capture and retain fibers that have penetrated the space beneath the heads is related to the head separation distance CCS

20     and the lateral stem dimension 'S'. Ideally the head separation distance CCS is at least 1.2 times, or between 1.2 and 2.0 times, or even between 1.4 and 1.8 times, the stem dimension 'S', particularly in arrays in which rows are staggered such that the stems are staggered and the heads are of similar dimension, such that each head is essentially equally spaced from each of six other heads, such as is shown in Fig. 4. We call this ratio of CCS to S the Spacing

25     Capture Ratio. Maintaining this ratio in the preferred range is also beneficial to the formation and use of molding sleeves configured to mold the fastener elements, as discussed below with respect to Fig. 15.

    The head 22 overhangs the stem on each side a distance 'OH' that is approximately half the difference between the head diameter 'C' and the stem diameter 'S' in this example

30     in which both are circular and the stem is centered under the head. In this example 'OH' was therefore approximately 0.014 mm on each side of the stem. The head can be said to have a

- 8 -

nominal thickness CT, measured parallel to the stem at a midpoint of the overhand distance OH.  In this example CT was measured to be 17.5 μm, but in various runs of the product the average head thickness was found to range from 0.012 to 0.028 mm.  Similarly, toe thickness TT is measured perpendicular to the base sheet at the base of a given toe.  The average toe

5    thickness for this example was measured to be 0.0145 mm, but in various runs the average toe thickness ranged from 0.009 to 0.022 mm.

Referring next to Fig. 8, fibers of a size compatible with the above-described fastener elements to form releasable fastenings include organic fibers such as cotton.  Such fibers 16 may have a nominal thickness of only about 5 to 7 μm and be of non-circular cross-section.

10    Fig. 9 shows a field of such fibers 16 snagged by an array of the above-described fastener elements 14.  As is evident from this photo, the engagement between discrete fibers and discrete fastener elements is stochastic, and it will be understood that the overall performance and load resistance of the fastening is a function of essentially thousands of discrete engagements.  This photo illustrates several different types of engagements, some of which

15    are particularly enabled by the fastener element structural features discussed above.

For example, the fiber 16 shown in Fig. 10 engages the visible fastener element by wrapping about the stem (not shown) of the fastener element but crossing the rim at the lower extent of the head in the photo.  Where it engages the rim it lifts one toe T1 from the plane of the head, passing under that toe and above an adjacent toe T2.  This fiber can be said to

20    engage the edge of the fastener element between adjacent toes, and it is evident that the existence of the toes helps to prevent sliding of the fiber across the rim of the head.  In other words, the toes T1 and T2 have a functional effect in the engagement of this fiber 16.

Fig. 10 also illustrates that the edge of the fastener element head can flex upward in response to a fiber-applied point load.  For a given resin, this flexibility is related both to the

25    head overhang distance and its thickness.  For ease of comparison, we have defined the term Edge Flex Ratio (EF) as the ratio of the difference between head and stem widths to the nominal cap thickness.  With reference to the dimensions shown in Figs 6 and 7, EF = (C-S)/CT.  The Edge Flex Ratio is preferably between 1.0 and 5.0, particularly for relatively flat mushroom heads with edge toes that further increase local flexibility as illustrated in Fig. 10.

30    In the photo shown in Fig. 11, the fastener element 14 near the center of the photo is engaged by several fibers 16 wrapped about its stem under the head, while an adjacent

- 9 -

Atty Docket No.: 05918-0697002

fastener element to the left is engaged by a fiber that has snagged just the head but has not wrapped about the stem. In this latter example, the fiber is caught between adjacent toes of the rim of the head, and tension in the fiber has deflected at least one of the toes to enhance retention of the fiber, thus adding to the overall shear resistance of the fastener.

5      Figs. 12 and 13 show further examples of fibers 16 engaged by just the rim of the fastener element head. In Fig. 12 the fiber 16 on the right is engaged between adjacent toes and tension in the fiber will tend to pull the fiber deeper into engagement, preventing slipping of the fiber along the rim. The fiber on the left has essentially bent one toe upward, out of its plane, as has both fibers 16 shown in Fig. 13.

10      The fastener elements described above are advantageously flexible in multiple modes in response to a laterally applied head load. The stem will tend to elastically bend over to tilt the head; the rim of the head may flex locally out of its plane to form a local side depression that helps to retain a fiber pulling on the head edge; and individual toes to which the load is applied may bend out of the plane of the rim. We have coined the term Total Flexure Product

15      (TF) as related to the first two of those three flexure modes, as the product of the Stem Bending Coefficient (SB) and the Edge Flex Ratio (EF). Mathematically, $TF = SB * EF$. The greater either of the two factors, the greater the overall flexure of the fastener element in response to a lateral load applied locally at the edge of the head. For resins suitable for high speed formation of fastener elements, the Total Flexure Product is preferably greater than 3.0,

20      or between 3.0 and 10.0. For the product shown in Figs. 2-5, the Total Flexure Product was 3.3.

     In some cases the relative flexibility of rim edge and stem is important. We define Edge Flex Preference as the ratio of Edge Flex Ratio and Stem Bending Coefficient, or EF/SB. This parameter relates to the relative flexibility of head edge and stem: the higher the

25      value, the more the edge (with or without toes) will flex before the stem itself bends over to help align the load and prevent release. For resistance of shear loads when engaged with fine fibers, Edge Flex Preference of a flat disk-headed fastener element is preferably between 0.3 and 6.0, more preferably between 0.5 and 5.

     Referring next to Fig. 14, resin fastener products such as shown in Fig. 1 (with any of

30      the fastener element arrays described above) can be made in a continuous roll-molding process in which molten resin 56 is introduced into a nip 58 between two counter-rotating

Atty Docket No.: 05918-0697002

rolls including a pressure roll 60 and a mold roll 62 that defines cavities in the shape of the above fastener elements.  Pressure in nip 58 forces the resin into the cavities, where it solidifies as contiguous resin solidifies on the surface of the roll before being stripped off of the mold roll by being passed around a stripper roll 64 and then spooled for storage.  In some

5   cases a preformed web 66 is introduced to the nip with the resin, such that while some of the resin is filling the cavities to form the fastener elements, resin forming the base sheet is laminated directly to the web surface, such as by the resin intermingling with surface features of the web, partially penetrating the web surfaces in the case of a fibrous web.  The spooled product in that case comprises the web with the base sheet of resin on one side of the web,

10   and the array of fastener elements extending from the base sheet.  The resin can be introduced to the nip in discontinuous volumes to form the base sheet in separate islands or patches or width-wise continuous lanes, each bearing fastener elements.  The resin can also be introduced in multiple, spaced apart lanes across the width of the web, to form a fastener product with continuous, longitudinal lanes of fastener elements separated by lanes of

15   exposed web surface.

    The male touch fastener products shown in Figs. 2-5 and 9-13 were molded from PPC7650 polypropylene, available from TOTAL, with 5% added whitener.  The tape was continuously processed as shown in Fig. 14, at a line speed of 58 meters per minute, resulting in a tape with an overall weight of 100 grams per square meter and an overall thickness,

20   including the base and fastener elements, of 0.23 millimeter.

    It is preferred that the heads of the fastener elements be molded in finished form in the cavities of mold roll 62.  However, in some cases it may be necessary to slightly flatten the heads after molding, such as by engaging the upper surfaces of the heads with a heated roller 68 that plastically deforms the heads to increase their flatness.  Preferably, the heat and

25   pressure applied by roll 68 is sufficient to flatten the upper head surface without melting away the toe structures formed about its periphery.  The heads shown in the photos described above have, for example, been slightly flattened by such a roll after being pulled from their molding cavities.  The effect of the flattening can be seen, for example, in Fig. 2, from which it can be seen that the outer rim area of the upper surface of each fastener element, containing

30   the toes, lies in a plane generally perpendicular to the stem, while the central portion of the



upper surface – that portion which may not have engaged roll 68 – forms a shallow depression.

Referring to Fig. 15, cavities shaped to form the fastener elements described herein can be defined in a sleeve 70 fit tightly to an outer surface of a cylindrical core 72 of mold roll 62, with the cavities extending all of the way through the sleeve such that the flat upper surfaces of the fastener element heads are formed on the outer core surface. Methods of laser cutting using a pulsed fiber laser, tilting the beam axis as it travels about the cavity perimeter, are capable of forming cavities of this shape and size in stainless steel, in some cases followed by a light etch. Screens with such cavities can also be made by electroforming techniques. Fastener element heads may be formed in rotationally symmetric cavities, such that the cross-section of the head-forming portion of the cavity as shown is similar in any plane containing the centerline of the stem. In other words, the toes may be formed within a smooth and continuous rim cavity that tapered to a sharp edge at the surface of core 72, and the inter-toe surfaces and bounded crevices are not themselves determined or formed by specific mold surfaces or features. The cavity surface is generously radiused between the portion forming the narrowest part of the stem and the core surface, which essentially forms a tangent to the arc of the cavity surface. The radius 'R' defined by this surface is preferably more than half the narrowest lateral extent of the cavity, and for molding the underside surface of the heads shown in Fig. 3 was about 50 μm, for example. As the resin is pressed at high rate into this ever-narrowing rim portion of the cavity, the toes form. As can be seen from the curved outer toe surfaces in the photographs discussed above, the resin flow eventually freezes and forms non-molded surfaces at the distal toe ends.

One hypothesis concerning why the resin flow forming the head rim splits into discrete flows as it approaches the distal extent of the rim cavity, with each flow chilling to form a separate toe structure, is that the rate of chill accelerates as the resin cross-section narrows, while air trapped in the rim cavity increasingly resists the advancing flow, causing the rim cavity to incompletely fill. As the solidified skin of the edge of the flow stretches circumferentially to fill the cavity, molten resin behind the skin breaks through in discrete regions to push forward as a toe, chilling and solidifying without merging with adjacent flows. Whatever the mechanism involved, we have found the formation of toes within the



Atty Docket No.: 05918-0697002

cavities and processing parameters described above to be quite repeatable within standard process control tolerances.

With reference to Fig. 16, we use the following procedure to determine the number of toes about the periphery of a fastener element head, and we use the word 'toe' with reference
5 to this method of determining whether a particular projection is or is not a toe. First, an image of the fastener element head is obtained, looking directly down at the upper surface of the head (i.e., in a direction perpendicular to the base sheet). Next, a line is drawn about the head representing the convex hull of the head perimeter. In this figure such a line is labeled CH. A toe-count line is then drawn spaced inside the convex hull line by a distance equal to
10 five percent of the longest distance from the head area centroid to the convex hull line. The toe count line is labeled TCL in the figure and represented as a dashed line. Next, the discrete positions about the head rim where the perimeter extends to within the TCL are counted. Such spaces are only counted if the width of the space (i.e., the inter-toe space) at the TCL is less than the width of the head perimeter along the TCL on each side of the space
15 before reaching another space. In other words, points at which one can see through the head inside the TCL are counted. The number of toes is taken to be equal to the number of such spaces. Note that in Fig. 16 the thickness of the TCL is increased for visibility, obscuring open space between some of the toes. In this example, 27 discrete toes labeled T1-T27 were found between corresponding open spaces.

20 Referring next to Fig. 17, cavities may be shaped to form non-circular heads with edge toes. The head 22 shown in this figure was formed in a screen cavity of similar shape to the one shown in Fig. 15, but with a non-circular stem cross-section and a correspondingly non-circular, smooth opening held against a cylindrical core surface. As a scale reference, the widest lateral extent of the head was approximately 0.46 millimeter and the narrowest
25 lateral extent approximately 0.28 millimeter. As seen, toes 24 were formed about at least much of the perimeter of the head and survived the cavity extraction process to define crevices for snagging microfibers.

Flexible products may be molded as continuous sheets with the fastener elements as described above, and then plastically stretched within their plane after molding to reduce the
30 thickness of sheet and decrease the density of the fastener elements. Stretching may be done laterally to improve the tear resistance of the sheet along the longitudinal direction, or

- 13 -

Atty Docket No.: 05918-0697002

biaxially.  The product may be stretched laterally to increase its area by up to a factor of seven, for example.

We have found samples of fastener product produced according to the above method to be particularly soft to the touch in comparison with certain other touch fasteners considered to exhibit softness.  To obtain objective measurements of this property, we subjected representative samples of the product shown in Figs. 2-5 to testing on a Toccare automated testing system from SynTouch Inc. of Montrose, California.  Sample preparation and testing was performed in accordance with the Toccare User Manual, Software Version 5.0 (2018), with the probe movement aligned with the machine direction of each of five samples.  The mean Toccare micro-texture coarseness measurement of the representative samples was 21.6, with a standard deviation of 3.8.  The mean Toccare micro-texture roughness measurement of the representative samples was 26.3, with a standard deviation of 0.8.  Also tested were five samples each of the fastener product shown in Figs. 1A-4 of U.S. Patent Application No. 15/680,447 (the contents of which are specifically incorporated herein by reference as they relate to the materials and dimensions of the illustrated embodiment), a molded polypropylene palm-tree hook sold by Velcro USA Inc. under the designation HTH 819 for use in disposable diapers, and a touch fastener sold by Gottlieb Binder GmbH under the designation MicroPlast.  These other touch fasteners exhibited mean Toccare micro-texture coarseness in the machine direction of 49.4, 56.0 and 34.7, respectively, and mean Toccare micro-texture roughness in the machine direction of 64.6, 83.0 and 49.6, respectively.  These measurements, taken at 20 degrees C and 30 percent relative humidity, were consistent with our subjective impression that the product produced as described above was significantly softer to the touch.

While a number of examples have been described for illustration purposes, the foregoing description is not intended to limit the scope of the invention, which is defined by the scope of the appended claims.  There are and will be other examples and modifications within the scope of the following claims.

- 14 -

Atty Docket No.: 05918-0697002

**WHAT IS CLAIMED IS:**

1.      A male touch fastener product, comprising

a resin surface;

an array of spaced-apart male touch fastener elements carried on the surface, each touch fastener element comprising

5                        a stem extending from the surface; and

                        a head disposed at a distal end of the stem, and forming with the stem and the surface a contiguous mass of resin, the head extending laterally from the stem to a distal edge overhanging the surface;

wherein the distal edge comprises multiple toes extending laterally outward and

10      varying in shape and size about the edge, with adjacent toes having facing, free-form resin surfaces defining crevices therebetween, the crevices being narrower than the adjacent toes.


2.      The male touch fastener product of claim 1, wherein the array comprises at least one row of the male touch fastener elements arranged such that heads of adjacent

15      fastener elements of the row are spaced from each other a distance that is between 1.2 and 2.0 times a minimum lateral dimension of the stems of the adjacent fastener elements.


3.      The male touch fastener product of claim 1, wherein for at least most of the fastener elements of the array, the ratio of a difference between the overall lateral extent of

20      the head and a minimum lateral extent of the stem to the overhang midpoint thickness is between 1.0 and 5.0.


4.      The male touch fastener product of claim 1, wherein the stem has a minimum lateral extent and a bend height defined as the perpendicular distance from the resin surface

25      to a lowermost occurrence of the minimum lateral extent, and wherein for at least most of the fastener elements of the array, the product of Stem Bending Coefficient and Edge Flex Ratio is between 3.0 and 10.0, where Stem Bending Coefficient is a ratio of a difference between overall height and bend height to the minimum lateral extent of the stem, and Edge Flex Ratio is a ratio of a difference between the overall lateral extent of the head and the minimum

30      lateral extent of the stem to the overhang midpoint thickness.

- 15 -

5.    The male touch fastener product of claim 1, wherein the stem has a minimum lateral extent and a bend height defined as the perpendicular distance from the resin surface to a lowermost occurrence of the minimum lateral extent, and wherein at least three adjacent fastener elements each has a Stem Bending Coefficient of between 1.4 and 2.0, where Stem Bending Coefficient is a ratio of a difference between overall height and bend height to the minimum lateral extent.

6.    The male touch fastener product of claim 1, wherein the edge has between 5 and 50 toes.

7.    The male touch fastener product of claim 1, wherein at least one of the crevices is defined between toe surfaces that are generally parallel over at least 30 percent of an overall length of the crevice.

8.    The male touch fastener product of claim 1, wherein the product exhibits a Toccare micro-texture coarseness, as measured on the array, of between 20 and 30.

9.    The male touch fastener product of claim 1, wherein the product exhibits a Toccare micro-texture roughness, as measured on the array, of between 25 and 40.

10.    The male touch fastener product of claim 1, wherein the stem has a molded peripheral surface.

11.    The male touch fastener product of claim 10, wherein the head has a molded underside surface.

12.    The male touch fastener product of claim 1, wherein the head is disc-shaped.

13.    The male touch fastener product of claim 1, wherein the head has an essentially flat upper surface.

- 16 -

14.    The male touch fastener product of claim 1, wherein the fastener elements extend to an overall height from the resin surface of between about 0.08 and 0.3 millimeter.

5        15.    The male touch fastener product of claim 1, wherein the head has an upper surface defining a central depression.

16.    The male touch fastener product of claim 1, wherein the head has an underside surface that defines a curve extending from a narrowest portion of the stem to the rim of the

10     head.

17.    The male touch fastener product of claim 1, wherein the array comprises staggered rows of fastener elements.

15     18.    The male touch fastener product of claim 17, wherein each head is essentially equally spaced from each of six other heads.

19.    A male touch fastener product, comprising

a resin surface;

20     an array of spaced-apart male touch fastener elements carried on the surface, each touch fastener element extending to an overall height above the resin surface and comprising

a stem extending from the surface and having a minimum lateral extent and a bend height defined as the perpendicular distance from the resin surface to a lowermost occurrence of the minimum lateral extent; and

25     a flat, disc-shaped head disposed at a distal end of the stem, and forming with the stem and the surface a contiguous mass of resin, the head extending laterally from the stem to a distal edge overhanging the surface, the head having an overall lateral extent and having an overhang midpoint thickness measured parallel to the stem from an underside of the head to an upper surface of the head at a position midway between the stem and the distal

30     edge;



- 17 -

Atty Docket No.: 05918-0697002

wherein for at least most of the fastener elements of the array, the ratio of Edge Flex Ratio to Stem Bending Coefficient is between 0.3 and 6.0, where Stem Bending Coefficient is a ratio of a difference between overall height and bend height to the minimum lateral extent, and Edge Flex Ratio is a ratio of a difference between the overall lateral extent of the head and the minimum lateral extent of the stem to the overhang midpoint thickness.

5

20.    A method of forming a male touch fastener product, the method comprising molding a resin surface; while

forming an array of spaced-apart male touch fastener elements extending from the surface, by

10

pressing moldable resin into respective molding cavities defined in a mold against which mold the resin surface is molded,

solidifying the pressed resin in the molding cavities, and then

stripping the solidified resin from the cavities as stems with associated heads disposed at distal ends of the stems and overhanging the surface;

15

wherein as stripped from the cavities the heads have distal edges comprising multiple toes extending laterally outward and varying in shape and size about the edge, with adjacent toes having facing, free-form resin surfaces defining crevices therebetween, each crevice narrower than the adjacent toes.

20

- 18 -

Atty Docket No.: 05918-0697002

## MALE TOUCH FASTENER ELEMENTS

### ABSTRACT

A male touch fastener product with a resin surface and an array of spaced-apart male
touch fastener elements carried on the surface.  Each touch fastener element has a stem
extending from the surface and a head disposed at a distal end of the stem and extending
laterally from the stem to a distal edge overhanging the surface.  The head, stem and surface
form a contiguous mass of resin, the head.  The distal edge has multiple toes extending
laterally outward and varying in shape and size about the edge, with adjacent toes having
facing, free-form resin surfaces defining crevices therebetween.  The fastener element is
particularly flexible and engages with very fine fibers.

5

10

24178179.doc



- 19 -

## <u>CERTIFICATE OF SERVICE AND FILING</u>

I certify that on July 11, 2025, I electronically filed the foregoing

**PRINCIPAL BRIEF** of appellant using the Court's CM/ECF filing system.

Counsel for appellee were electronically served by and through the Court's

CM/ECF filing system per <u>Fed. R. App. P. 25</u> and <u>Fed. Cir. R. 25(e)</u>.


*/s/ Lauren A. Degnan*
Lauren A. Degnan

## <u>CERTIFICATE OF COMPLIANCE</u>

The **PRINCIPAL BRIEF** of appellant is submitted in accordance with the type-volume limitation of <u>Fed. Cir. R. 32(b)</u>. The brief contains 11,680 words, excluding the parts of the brief exempted by <u>Fed. R. App. P. 32(f)</u> and <u>Fed. Cir. R. 32(b)(2)</u>. This brief has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 in Times New Roman, 14 Point.

Dated: July 11, 2025                           */s/ Lauren A. Degnan*
                                                Lauren A. Degnan